Argued March 15, affirmed July 1, petition for rehearing denied
July 27, petition for review denied September 21, 1971

## CARDWELL, *Appellant, v.* STATE ACCIDENT INSURANCE FUND, *Respondent.*

486 P2d 587

*Roy Kilpatrick,* John Day, argued the cause for appellant. With him on the briefs were Robert D. Dayton and B. J. Matzen, John Day.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FOLEY and THORNTON, Judges.

FOLEY, J.

This workmen's compensation proceeding was instituted by Evelyn Cardwell to recover benefits from the State Accident Insurance Fund for the death of her husband, William Cardwell. The claim was denied initially on October 24, 1967, by the Claims Division of the then State Compensation Department on the ground that there was no evidence that Mr. Cardwell's death arose out of or in the course of employment as required by statute. ORS 656.002 (6). Following a hearing on the matter, the hearing officer

affirmed the denial of compensation. Upon review the Workmen's Compensation Board affirmed the order of the hearing officer. Claimant appealed to the Circuit Court for Grant County and was again denied compensation. She seeks for the fifth time a decision in her favor by appealing to this court from the judgment order of the circuit court. We review de novo.

The deceased, William Cardwell, was employed by the municipality of Canyon City, Oregon, as a maintenance man. While at work on July 31, 1967, he collapsed and was pronounced dead shortly thereafter. The immediate cause of death entered on the death certificate was a coronary occlusion. No autopsy was performed. The sole question to be answered on this appeal is whether there was a causal connection, both legal and medical, between decedent's work activities and his death.

Decedent, who was 62 years old at the time of his death, had a history of heart disease. Dr. Brian King, a general surgeon, first treated decedent on July 7, 1965, for what he diagnosed as "calcific aortitis of the aortic valve." He examined Mr. Cardwell again on February 16, 1966, and determined that decedent's "heart failure" had probably increased. Dr. King did not see Mr. Cardwell again until the day of the latter's death when Dr. King examined him shortly after his arrival at the hospital following his collapse. Dr. King testified that in his opinion death was caused by aortic stenosis (narrowing of the aortic valve) and aortic incompetence (inadequacy).

Mr. Cardwell consulted another physician and surgeon, Dr. Howard Newton, on May 24, 1967. Dr. Newton testified that Mr. Cardwell was then suffering from "congestive heart failure, presumably on an

arteriosclerotic basis with aortic stenosis." Dr. Newton examined decedent again on June 9, 1967, and advised his patient that he was almost an emergency candidate for a heart valve replacement operation. An appointment at the University of Oregon Medical School in Portland was thereafter scheduled for August 21, 1967. Dr. Newton testified that the actual cause of Mr. Cardwell's death was probably either obstruction at the coronary ostia with resulting elimination of a coronary artery or protracted ischemia (deficient blood supply) upsetting the normal electrical activity of the myocardium (heart muscle). Both causes, he stated, are common results of aortic stenosis.

A third physician, Dr. M. T. Merrill, who did not testify at the hearing, gave evidence in the form of a letter which, apparently, was accepted by the parties and the hearing officer as a substitute for a deposition. Dr. Merrill examined decedent upon his arrival at the hospital on July 31, 1967, and signed the death certificate which bore the diagnosis that Mr. Cardwell's death was caused by coronary occlusion. Dr. Merrill indicated that the last time he had seen decedent as a patient was on January 24, 1967. Dr. Merrill further stated in his letter that his opinion as to the cause of death was the same at the time of writing as it was when he signed the death certificate,

"* * * that death was caused by sudden onset of arrhythmia [irregularities of the heartbeat] produced by coronary occlusion, whether partial or complete. The fact that he was known to have stenosis of the aortic valve makes this probability even greater."

On July 31, 1967, the day of his death, Mr. Cardwell arose at 6 a.m., dressed and then drove the city pickup truck to the reservoir to chlorinate the

water. This task required that decedent obtain water from the reservoir by lowering a five-gallon pail on a rope into the water and walk 40 or 50 feet on a level plane to the chlorinating house where he would pour the water into a stone crock. This process had to be repeated three or four times to complete the job. The vertical difference between the water level in the reservoir and the lip of the crock was about seven feet. After chlorinating Mr. Cardwell returned to his home, ate breakfast and left for city hall between 7:30 and 7:45. He then mowed the lawn at the city park with a self-propelled walk-behind mower. This job ordinarily took an hour to an hour and a half to complete. Decedent thereafter mowed a smaller lawn at city hall. At some time during the morning Mr. Cardwell joined the fire chief and the two rode around the town for approximately 25 minutes investigating a false fire alarm. Mr. Cardwell also drove a tractor to the city dump that morning and plowed under the garbage accumulation.

At approximately 11:30 a.m. decedent and Mrs. Cardwell, who was preparing the monthly city water bills for mailing, went home for lunch. After eating Mr. Cardwell returned to city hall between 11:45 a.m. and noon to work on the water bills. Upon his arrival at city hall decedent apparently loaded one or more garbage cans filled with grass clippings onto the pickup truck. Mrs. Cardwell returned to city hall at about 12:15 or 12:20 and found her husband lying on the floor, unconscious. He was rushed to the local hospital where he was pronounced dead.

In order for decedent's death to merit an award of compensation to plaintiff the evidence must support a finding that both legal and medical causation existed. Without discussing legal causation, the hearing officer

concluded that there was no medical causal relationship between decedent's work activities and his fatal heart attack. His conclusion was affirmed by the Workmen's Compensation Board and the circuit court. The issue of legal causation was not reached and in view of our conclusion it is not necessary to discuss it.

■ ■ · The test for determining medical causation is whether the stress or exertion connected with decedent's job was a material contributing factor of the fatal heart attack. *Coday v. Willamette Tug & Barge,* 250 Or 39, 440 P2d 224 (1968) ; *Mayes v. Compensation Dept.,* 1 Or App 234, 461 P2d 841 (1969). This is a question of fact and as triers of fact we are required to select which medical hypothesis is correct where, as here, conflicting ones are presented. *Sahnow v. Fireman's Fund Ins. Co.,* 3 Or App 164, 470 P2d 378 (1970), *aff'd* 260 Or 564, 491 P2d 997 (1971).

Dr. Newton testified that, in his opinion, decedent's work on July 31, 1967, was not a material contributing factor in his death. However, the doctor admitted that he did not think one could come to a conclusion in a case such as this with much assurance. His lack of certainty seems to have been founded in his opinion that there were many unknown variables in this case. Dr. Merrill was also of the opinion that decedent's work activities were not a material contributing factor in his death.

Dr. King, on the other hand, believed that the deceased's work activities, including any mental stress involved in preparing the city water bills, were a material contributing factor in Mr. Cardwell's demise. Dr. King was, however, reluctant to be pinned down to the amount of time by which decedent's work activities shortened his life. He initially stated that he could not determine whether the work hastened death

by a month, a day "[o]r any time for that matter."
Upon further cross-examination Dr. King stated that
the deceased's job activities probably hastened his
death by one hour or more. On the whole, this testi-
mony suggests that the work activity was a minimal
rather than a material contributing cause of death.
In other portions of his testimony Dr. King ac-
knowledgd that Mr. Cardwell had been suffering from
what was, in the absence of cardiac surgery, a terminal
heart disease and that the disease was capable of
bringing about death without any exertion on the part
of the decedent.

The testimony of these physicians indicates all
too clearly what difficult decisions courts are faced
with in heart attack cases. In the present case we
can weigh additional conditions such as the facts that
no autopsy was performed, that Doctors Newton and
Merrill had examined decedent closer to the day of
death than had Dr. King, that at the moment of death
Mr. Cardwell was apparently not engaged in any sort
of strenuous activity, that Dr. King spent five years
at the Mayo Clinic engaged in heart surgery for all
or part of that time, and that at 62 years of age Mr.
Cardwell was a man whose life was, in the words of
Dr. King, balanced on a "very delicate knife edge."

It is, however, a fundamental principle of
workmen's compensation law that a claimant must
prove by a preponderance of the evidence that he or
his decedent sustained a compensable injury. *Swan-
son v. Westport Lumber Co.*, 4 Or App 417, 479 P2d
1005 (1971). We find that claimant has failed to carry
her burden. We therefore affirm the circuit court's
denial of compensation to claimant.

Affirmed.