499 P.2d 1364 (1972)
In the matter of the Compensation of Bernard E. GIESE, Claimant.
Bernard E. Giese, Appellant,
v.
SAFEWAY STORES, Respondent.
Court of Appeals of Oregon, Department 2.
Argued and Submitted July 27, 1972.
Decided August 10, 1972.
*1365 Allen T. Murphy, Jr., Portland, argued the cause for appellant. With him on the brief were Green, Richardson, Griswold & Murphy, Portland.
Charles R. Holloway, III, Portland, argued the cause for respondent. With him on the brief were Tooze, Kerr & Peterson, Portland.
Before SCHWAB, C.J., and LANGTRY and FORT, JJ.
LANGTRY, Judge.
Claimant appeals from a judgment that a coronary occlusion or thrombosis, resulting in a myocardial infarction, suffered on the job was not materially contributed to by claimant's work activity. The hearing officer had found that the work activity was a material contributing factor, and the Workmen's Compensation Board had reversed that finding.
On the day claimant suffered the heart attack he started work at his job as a meat cutter at 7 a.m. The attack came about 55 minutes later. His job was to cut sirloin tips from beef hindquarters hanging by hooks set on rollers on an overhead track in a meat processing plant. Evidence was that the tip is usually "pulled" from the quarter with two or three strokes of a sharp knife, but that it can be cut in one continuous stroke by the expenditure of considerable strength and energy, even in cold, hard meat such as was being processed. The claim is based upon the contention that claimant had been urged by a fellow workman to speed his work up by doing the one-stroke cut, and that he had been doing it continuously at the rate of one and a half to two cuts per minute for 15 or 20 minutes with expenditure of much energy, immediately before the attack occurred. The fellow workman testified that he remembered when claimant became ill, but did not remember that he had urged the speed-up, or cutting with one stroke. However, he did not testify that it did not happen, agreeing that such occurrences were common and that it could have occurred without his remembering about it.
Two heart specialists, Drs. Rogers and Sutherlin, testified. A deposition was taken from a general practitioner, Dr. Gray, who attended claimant upon his admission to the hospital on the date of the heart attack. The report of Dr. Griswold (professor of cardiology at the University of Oregon Medical School) is in the record. Drs. Rogers and Sutherlin had viewed a motion picture taken sometime afterward of ordinary tip cutting on the line in question. Our understanding of Drs. Rogers' and Sutherlin's testimony, respectively considered as a whole, is that in the opinions of each the ordinary activity, or several of the described one-stroke cuts would not have been such stress as to have been a contributing cause of the thrombosis, but that continuous one-stroke cuts with expenditure of great energy could have been such a cause.
Dr. Gray was of the opinion that the work activity was a material factor. However, he based his opinion on the history he had taken, and his notes were that claimant informed him that he had been doing his usual work  "lifting sides of beef." It is *1366 undisputed that such information was erroneous.
Dr. Griswold's report was that in his opinion "* * * the work activity * * * particularly cutting off * * * of tip * * * in one swoop did contribute * * *. He [claimant] states that * * * this single stroke was unusual * * *." The report does not disclose what information Dr. Griswold had about whether the one-stroke activity had been continuous or isolated.
The variety of opinions we have before us makes it important to determine, if possible, just what claimant's activity had been preceding the attack.
He told Dr. Gray on the day of the attack that he had been lifting sides of beef. At the time he was very sick and quite apprehensive. It is understandable that he may not have related events with accuracy. We do not know just what he told Dr. Griswold, with whom he consulted nine months later, about the activity except that, necessarily, he mentioned unusual one-stroke cuts.
On the witness stand, in direct examination he testified:
"Q How long had you been doing this one stroke technique?
"* * *
"A Oh, fifteen, twenty minutes."
On cross-examination:
"Q And you don't know whether you were able to complete the cut or not?
"A I think that I had to * * * I am pretty sure that I could do it.
"Q You could or you did?
"A I could and did.
"Q Now, this is just on one tip, or is this on several?
"A He made the jesture [sic] [the fellow workman, to speed the work up by using the one cut] two or three times.
"Q And so, you did it two or three times?
"A I would say that I tried two or three times.
"* * *
"A Did I do it in one stroke?
"Q Yes?
"A I believe I did, yes."
On redirect he testified:
"Q And you say that you were doing it for about fifteen or twenty minutes?
"A Yes.
"* * *
"A I am saying that this could be done and that  I am saying that it can be done and I possibly did do it, as I recollect, that I did do it. If I am not mistaken, but  (interrupted)"
On recross he testified:
"Q All right, it is possible that you didn't do it or that you did not make those one cut strokes?
"A I am saying that I did do it or that I approximately did to do it. I am saying that I did do it."
The hearing officer then questioned:
"Q I gather that what you have testified from the actions of Mr. Brehoney, I believe the name is, you were prodded into accelerating the speed of your work?
"A Yes.
"Q I gather that you were being prodded to accelerate and that you proceded [sic] to work faster?
"A Yes.
"* * *
"Q This elusive one stroke, if it is regarded as a pure stroke without any imperfections is not really too important, except that it is something that he tried to do and while in the process of trying to do so, you feel that this was the extra effort?
"A Yes."
The hearing officer saw and heard the witnesses. Despite the confusing testimony of claimant the hearing officer obviously believed that claimant did make sense, and concluded that the claimant's testimony substantiated the contention that claimant worked at top speed for 15 or 20 minutes immediately preceding the attack, and that *1367 this, viewed in light of the medical evidence, supported the claim. The question of fact is close, and could be resolved either way with justification. Under the circumstances we have related we incline to the decision of the fact-finder who saw and heard the witnesses.[1]
Reversed, and the order of the hearing officer is reinstated.
NOTES
[1] In Hannan v. Good Samaritan Hosp., 4 Or. App. 178, 471 P.2d 831, 476 P.2d 931 (1970), Sup.Ct. review denied (1971), we said:

"In so far as the resolution of an issue turns upon the credibility of witnesses the court should give weight to the findings of the hearing officer who saw and heard those witnesses * * *.
"* * *
"* * * When the situation calls for us to give weight to the findings of the individual who saw and heard the witnesses or to defer to administrative expertise based upon repetitive performance of specialized functions, we must look back, not to the findings of the circuit court, but to the administrative findings. * * * By the same token we cannot in any way be bound by those findings. * * * Having performed our function in the manner outlined we have the duty to resolve such cases as our independent judgment dictates. If we differ with the circuit court it is not that we are more final because we are more infallible, but that we are more infallible because we are more final."