Argued April 18, reversed May 20, reconsideration denied
June 25, petition for review denied September 4, 1974

HELMER, *Respondent, v.* STATE ACCIDENT
INSURANCE FUND (No. 394-827),
*Appellant.*

522 P2d 231

*Al J. Laue,* Assistant Attorney General, Salem,
argued the cause for appellant. With him on the brief

were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Allen G. Owen,* Portland, argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and FOLEY and THORNTON, Judges.

FOLEY, J.

This is a workmen's compensation case. The claimant suffered a heart attack and the question for determination is whether or not the heart attack was causally connected to claimant's work. The hearing officer determined against the workman as did the Workmen's Compensation Board. The circuit court reversed, finding that the heart attack was work-connected and the State Accident Insurance Fund appeals.

The hearing officer's opinion fairly sets forth the facts:

"At the time of the contested incident claimant was a 50-year-old meat cutter who owned and operated the Russellville Market at 10301 S.E. Stark, Portland, Oregon. He has worked at this trade since 1936, having started as an apprentice, except for three and a half years in the Navy. From 1957 until 1972 he managed meat markets in some of the larger grocery stores and in April 1972 purchased and opened the Russellville Market. He elected coverage as a self-employed person.

"Claimant had suffered with an ulcer since 1963 so discomfort or epigastric pressure near the stomach and just below the breast bone were not unusual experiences for him. On Thursday, October 26, 1972 claimant noticed a stomach discomfort and

began drinking rich milk (Half and Half) to coat the stomach and relieve the discomfort. This brought temporary relief but did not change the progression of the problem. On Friday claimant was worse and began taking Maalox, turned pale in appearance and developed periods of sweating. Rest, milk and Maalox gave temporary relief.

"On Friday evening claimant worked two hours extra, a common occurrence on Fridays, and arrived home feeling quite ill. He ate a dinner of beef broth which his wife had selected because of claimant's illness. While eating and watching television, claimant had another episode of discomfort and a 'feeling of pressure' just below the breast bone but this time it was a little more painful and some pain extended into his shoulders and his arms. Rest, milk and Maalox did not relieve the discomfort at this time and claimant walked around the house for additional relief. He retired early that evening. That the discomfort on this occasion was not relieved by rest, milk and Maalox is a distinction which assumes great importance in determining the probable time of the myocardial infarction.

"Claimant worked on Saturday until about 3:00 p.m. when his condition was much worse, longer rest periods were required, sweating was more noticeable and his color was described as green or gray. He consulted Dr. Reiner by telephone on Saturday and went to the outpatient clinic at Portland Adventist Hospital Sunday morning for a further checkup. An EKG at that time confirmed a myocardial infarction of recent date and the enzyme studies placed the time at about 36 hours prior to the examination. On the basis of these facts the doctors are in agreement that the myocardial infarction occurred at about 8:00 p.m. on Friday, October 27, 1972. The Hearing Officer so finds."

As the hearing officer found, both doctors agreed that the myocardial infarction occurred while the patient was at home after work. This was at a time

during the evening when he was eating dinner and watching television.

His treating doctor, Dr. Estill Deitz, an internist who testified that his practice involves 45 to 50 per cent heart cases, felt that the evening cardiac attack was work-connected. He stated in answer to the question of whether he believed claimant's work activity "* * * was a material, contributing factor to the production of the myocardial infarction":

"A   Yes, I believe that it was a contributing factor.

"Q   And upon what basis do you make this opinion?
"A   Well, I think this would be based on the fact that Mr. Helmer had had symptoms several days prior to coming into the hospital, he had had definite aggravation of symptoms during his work activities. He had noted lifting, working fast, made it worse, perspiring. He had noted going into the cold atmosphere of the freezer would tend to make the symptoms worse, and whether or not it actually caused it, I can't answer that question, but I do feel it was a contributing factor."

The other doctor, Dr. Herbert Griswold, Jr., a cardiologist specializing in that field, acknowledged the possibility of a preinfarction syndrome while the claimant was working rather than the epigastric distress described by claimant. After hearing the testimony of the claimant and his witnesses at the hearing, however, he testified:

"It would be my feeling, based upon this information—this is my first opinion—that he probably had some peptic ulcer disease, and while watching television Friday evening, on the 27th, he had a myocardial infarction. As I heard the story, that would be one opinion.

"As I heard the story of Mr. Helmer, in which he was doing various things, going into the cold, coming back, he developed this epigastric distress, again, no note that I heard, and I listened very closely, this pain was pretty much what would be covered by a hand in the epigastric region, no radiation there except little pain into the shoulders a couple of times, one would raise the question, if he wasn't having some angina during that period of time. However, the heart attack, by the documentation, the consistency of two physicians' histories, taken independently, as well as the history secured by the investigator for the State Accident Insurance Fund, I am certain that the heart attack occurred while off work, on the evening on or about 8:00 P.M., Friday, the 27th of October.

"Q Now, with reasonable medical probability, Doctor, and assuming that the actual infarction did occur the evening of Friday while he was watching television, and all based on reasonable medical probability, would any of the preceding events, pains or what have you at work, or the conditions of work, in your opinion, bear any substantial or material causal relationship to the happening of the infarction at the time and place it, in fact, happened?

"A Probably not, and the reason is that, usually, most cardiologists feel, if there is a causal relationship between work and myocardial infarction, it must be related, usually, in a time sequence and to a specific activity. In other words, a person must perform a certain task at that time, within a period—a reasonable period of time, develop a myocardial infarction. Based upon the data in the record, I would say he probably was having peptic ulcer disease, because even Dr. Deitz, in his admitting note, includes this in his diagnosis, and Dr. Deitz, in that note, probable felt he probably had both at that time or he wouldn't have put it in the initial note, which is in the medical record."

On cross-examination Dr. Griswold testified:

"Q You would have to say that there is a possibility, if not a probability that the work activities aggravated the coronary artery disease contributing to the myocardial infarction?

"A I could say possible. The fact that this occurred in the evening while he was off work puts it in the usual realm of possibility, not probability."

The expert medical testimony gives rise to two possible interpretations. Either the claimant, in the two days preceding the claimant's myocardial infarction, was suffering from a peptic ulcer disease and fortuitously sustained the myocardial infarction on Friday evening, or the claimant was having a pre-infarction syndrome which culminated in the evening myocardial infarction. Both medical experts agreed that the claimant's symptoms preceding the heart attack could have been consistent with cardiac distress. Claimant urges that there was no objective evidence that he was, in fact, suffering from a peptic ulcer. However, his own testimony and the symptomatology expressed through his own doctors indicated that he was suffering from peptic ulcer disease.

■ We review the record de novo and are required to make our own determination from the facts developed by the medical testimony.

"* * * This is a question of fact and as triers of fact we are required to select which medical hypothesis is correct where, as here, conflicting ones are presented. *Sahnow v. Fireman's Fund Ins. Co.,* 3 Or App 164, 470 P2d 378 (1970), *aff'd* 260 Or 564, 491 P2d 997 (1971)." *Cardwell v. SAIF,* 6 Or App 175, 180, 486 P2d 587, Sup Ct *review denied* (1971).

■ The burden is upon the claimant to prove a causal connection between the work activity and the compen-

sable injury—in this case, between the work activity and the myocardial infarction. The hearing officer found that that burden had not been met, which finding was concurred in by the Workmen's Compensation Board. The Board said:

> "The Hearing Officer's order denies the claim and faithfully summarizes the evidence including the medical opinions.
>
> "There is expert medical testimony that no causal connection exists; there is also expert medical testimony that causal connection exists. This case must be resolved by its own facts and the medical opinion applied to the facts.
>
> "* * * * * *"

The Workmen's Compensation Board concluded that claimant's myocardial infarction did not arise out of his employment.

■ We agree with the determination made by the hearing officer and the Workmen's Compensation Board and find that claimant failed to meet his burden of proving that the work activity bore a causal connection to claimant's myocardial infarction. *See Schwehn v. SAIF*, 17 Or App 50, 520 P2d 467, Sup Ct *review denied* (1974).

Reversed.

SCHWAB, C. J., specially concurring.

I concur with the result by Judge FOLEY, but reach that result on somewhat different grounds. Contrary to the majority opinion, I agree with Judge THORNTON that the weight of the evidence indicates that the symptoms claimant suffered while at work were those of a pre-infarction syndrome rather than of peptic ulcer disease. However, I think there is a substantial difference between the fact situation here

and that of *Giese v. Safeway Stores,* 10 Or App 452, 499 P2d 1364, 501 P2d 982, Sup Ct *review denied* (1972). Here, both doctors agree that the actual infarction did not occur at work or shortly following any strenuous activity, but rather occurred many hours after the initial symptoms while claimant was at home watching television. In *Giese* the infarction immediately followed the on-the-job physical exertion.

As I interpret the testimony in the case at bar, Dr. Griswold testified that even assuming that claimant's on-the-job distress was a pre-infarction syndrome rather than gastric trouble, he was of the opinion that because of the delay between the physical effort and the infarction it was at most possible, and by no means probable, that the physical activity contributed to the infarction. Dr. Griswold's conclusion was that claimant's myocardial infarction was probably the result of the natural progress of coronary artery disease, not materially contributed to by any on-the-job activity.

Dr. Deitz, claimant's attending physician, although he stated in response to a direct question that he believed that the on-the-job activity was a contributing factor to the myocardial infarction, proceeded to testify in rather guarded terms as to probabilities, stating:

> "Well, I don't think that the working conditions would have any great effect on the natural course of an arteriosclerotic disease. However, I feel that there are many things that can be instrumental in precipitating an acute episode. His physical activity, or heavy physical activity, I think that in his particular case, going into the cold freezer, I think that this caused some element of contraction, *might have been an aggravating factor* * * *." (Emphasis supplied.)

A case of this kind must of necessity largely turn on the medical evidence. The record reveals two competent physicians displaying complete integrity in attempting to deal with a very difficult, if not currently insoluble, problem. In attempting, as under the law we must, to determine whether a heart attack is or is not contributed to by the stress of employment, we are attempting to provide an answer to what doctors generally agree is in many, if not most, instances an unanswerable question.

All I can add is that although the question is a very close one I do not find that the claimant has carried his burden of proof.

THORNTON, J., dissenting.

This case bears several similarities with *Giese v. Safeway Stores,* 10 Or App 452, 499 P2d 1364, 501 P2d 982, Sup Ct *review denied* (1972), where claimant, also a meatcutter, suffered a myocardial infarction immediately following 15 to 20 minutes of strenuous work. Again there was a conflict in the medical testimony on the issue of whether the work activity was a material factor. In *Giese,* however, the hearing officer found medical causation. The Board reversed and we in turn reversed the Board and the trial judge, allowing the claim. Dr. Griswold testified in both cases, giving his opinion in *Giese* that the claimant's exertion did contribute to the infarction.

In the case at bar it appears that Dr. Griswold expressed two conflicting opinions. His first opinion was that claimant's work activities did not contribute to his heart attack. The second opinion was that they did contribute to that attack. Claimant testified that he had what was diagnosed as a duodenal ulcer con-

dition in 1963; that he had experienced what he thought were flareups of this condition about once a year through the ensuing years; and that the volume of work activity on Thursday was at least double the usual workload. There was also testimony by other witnesses which, in addition to corroborating claimant's testimony concerning the exertion and his enforced rest periods after the same, also described claimant's unusual facial color as the episode progressed.

It was the opinion of claimant's treating doctor, Dr. Estill Deitz, that claimant's work activity was a material contributing factor to the production of the myocardial infarction.

Dr. Griswold, in his written report dated February 26, 1973, stated in part as follows:

"From a medical-legal standpoint this is not a case in which one can state that the work activity was probably not related to his developing the infarction * * *."

In the course of his testimony at the hearing he stated:

"Well, I will have to give two opinions * * *.
"* * * * *
"* * * [T]his is my first opinion [before hearing the testimony] — that he probably had some peptic ulcer disease, and while watching television Friday evening, on the 27th, he had a myocardial infarction * * *.

"[Second opinion] As I heard the story [testimony at the hearing] of Mr. Helmer [claimant], in which he was doing various things, going into the cold, coming back, he developed this epigastric distress, again, no note that I heard, and I listened very closely, this pain was pretty much what would be covered by a hand in the epigastric region, no radiation there except little pain into the shoulders a couple of times, one would raise the question, if he

wasn't having some angina during that period of time * * *."

And then on cross-examination Dr. Griswold testified further:

"Well, he may have been having a pre-infarction syndrome, in other words, he may have had angina, as described by Mr. Helmer [claimant] and Mr. Helmer's son. That data was not available to me * * * so there is — I must say, if he was having a pre-infarction syndrome, the work activity may have aggravated it * * *."

It seems to me that the effect of the foregoing is to leave us with two opinions by Dr. Griswold; one that claimant's work activities did not contribute to the infarction, and the other that those activities did contribute. See also Dr. Griswold's testimony quoted in *Clayton v. Compensation Department,* 253 Or 397, 401, 454 P2d 628 (1969).

Having read the entire record, I believe there is sufficient credible evidence to conclude that claimant was experiencing a pre-infarction syndrome, rather than an ulcer flareup, during the period prior to and the actual infarction, and that claimant's on-the-job physical exertion was a material contributing cause to his infarction. I would affirm the trial judge and allow the claim.