COSTELLO, *Respondent,*
*v.*
GEORGIA-PACIFIC CORPORATION, *Appellant.*
(No. 76-751, CA 7182)

561 P2d 654

Jack Mattison, Eugene, argued the cause and filed the brief for appellant.

Roger Todd, North Bend, argued the cause for respondent. On the brief was Flaxel & Todd, North Bend.

Before Schwab, Chief Judge, and Thornton and Lee, Judges.

LEE, J.

## LEE, J.

In this workmen's compensation case Georgia-Pacific Corporation (employer) appeals from an order of the circuit court, affirming decisions of both the referee and the Workmen's Compensation Board, requiring it to accept claimant's application for compensation benefits. The sole issue presented is that of causation, employer contending that the circuit court, like the referee and Board before it, erroneously concluded that claimant's employment activities were a material contributing factor to the "injury"—a myocardial infarction—suffered by him on February 23, 1975.

■■  Where, as in this case, the occurrence of a "heart attack" or the development of a disabling heart condition of some kind is alleged to be a compensable injury or disease,[1] the claimant has the burden of establishing by a preponderance of evidence that his or her physical exertion while working—exertion which may be routinely associated with the claimant's job and which need not be any more strenuous than that commonly expended by the claimant during nonworking hours[2]—was a material contributing factor producing the attack or condition.[3] The essential causal

---

[1]
  "A 'compensable injury' is an accidental injury * * * arising out of and in the course of employment requiring medical services or resulting in disability or death * * *." ORS 656.005(8)(a).

  "(1) * * * '[O]ccupational disease' means:

  "(a) Any disease or infection which arises out of and in the scope of the employment, and to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein." ORS 656.802(1)(a).

[2] *Coday v. Willamette Tug & Barge,* 250 Or 39, 440 P2d 224 (1968); *Wisherd v. Paul Koch Volkswagen,* 27 Or App 601, 557 P2d 55 (1976), Sup Ct *review denied* (1977); *Anderson v. SAIF,* Or App 580, 485 P2d 1236 (1971).

[3] *Clayton v. Compensation Department,* 253 Or 397, 454 P2d 628 (1969); *Summit v. Weyerhaeuser Company,* 25 Or App 851, 551 P2d 490, Sup Ct *review denied* (1976); *Riutta v. Mayflower Farms, Inc.,* 19 Or App 278, 527 P2d 424 (1974), Sup Ct *review denied* (1975); *Cardwell v. SAIF,* 6 Or App 175, 486 P2d 587, Sup Ct *review denied* (1971).

link between the employment activities and the heart injury or disease alleged to be compensable in these cases must of necessity be established by expert medical opinion.

Claimant, 61 years of age and in good health with no history of heart problems, had been employed by Georgia-Pacific for some 13 years when he reported for work on the morning of February 22, 1975. Although he had been aware of chest pains which occasionally radiated into his left shoulder and arm upon arising that morning, they had subsided by the time he had eaten breakfast and driven to employer's mill to begin work at 7 a.m. Following a coffee break at approximately 10 a.m. claimant had decided to "set the cut-off saw," a rather strenuous task regularly performed by claimant every two weeks.[4] This particular job usually took 35 minutes or so to complete, and claimant would typically have to stop and rest a couple of times during the procedure as his arms would tire and begin to ache from having to manipulate the hand tools as required. In the course of carrying out the procedure on the morning of February 22, 1975, however, in addition to the fatigue normally associated with the job claimant experienced an extending aching in his left arm. Throughout the remainder of the day claimant was bothered by recurrent chest pains, with radiation out into his left arm, which forced him to intermittently stop whatever he was doing and rest. Following the completion of his shift at 3:30 p.m. claimant took his wife out to dinner and returned home; at approximately 9 p.m. while watching television claimant's chest pains, of which he had been aware since dinner, became more persistent and severe and he was persuaded by his wife to request an examination at the Bay Area Hospital in Coos Bay. Seen in the emergency

---

[4]The "cut-off saw" is a large circular saw about eight feet in diameter with 158 teeth around its perimeter. Claimant would "set" the saw by (1) placing a small anvil weighing between eight and nine pounds on each side of each tooth and striking the anvil with a hammer one or two times, and (2) tightening each of the 158 rivets behind the saw's teeth.

room claimant was thereafter admitted to the hospital for observation at approximately 10 p.m. At 6 a.m. the following morning, February 23, 1975, claimant suffered the myocardial infarction upon which his claim for compensation benefits was based.

Two physicians have offered conflicting opinions on the question lying at the crux of this case: Did claimant's work activities of February 22, 1975 materially contribute to the occurrence of the infarction on the following morning? Dr. Wayne R. Rogers, a cardiac specialist who had no opportunity to examine claimant and thus based his opinion upon his review of relevant hospital records, took the position that there was no causal link:

"* * * [Claimant was suffering from a] [n]atural arteriosclerotic disease of the posterior-inferior circulation [which] reached critical proportions the early morning of 2/22/75 without any precipitating factor known to me. He then temporarily but immaterially aggravated the cardiac pain in anginal form during an ordinary working day without any prolonged episode of pain until that evening after supper, when apparently the stress of the dinner meal caused the second severe coronary insufficiency and this led to hospitalization and a full thickness myocardial infarction the following morning.

"Had he been hospitalized and intensively medically treated the morning of 2/22/75, it is likely but not probable that he could have postponed the myocardial infarction that occurred the following morning. On the other hand, in the absence of any very prolonged and severe episodes of pain during the working day of 2/22/75, it would be my opinion that the work of that day did not materially aggravate the already existent acute coronary insufficiency that usually does tend to recur and progress in the absence of adequate treatment."

Noting that claimant had, in fact, indicated that he had suffered "severe episodes of pain" while at work on February 22, 1975, particularly after having "set" the cut-off saw, Dr. Phyllis Brown, a specialist in internal medicine who examined claimant immediately after his infarction and continued to treat him

thereafter, concluded that claimant's work activities *had* materially contributed to the heart attack he ultimately suffered, testifying as follows:

> "If he were having chest pain on February 22nd as he described to me, it would be my opinion that he was having angina, which would indicate to me that he was having heart muscle which was not getting an adequate supply of blood and any activity which he would do which would require more blood to the muscle would aggravate this condition. So in that sense, yes, his activities did contribute to his heart attack.
>
> "* * * * *
>
> "Angina is pain which originates from cardiac muscle which is not getting as much blood, therefore not getting as much oxygen as it needs to do the work which it's being asked to do.
>
> "* * * * *
>
> "* * * He was having angina and irrespectively we can say for sure he was having angina because he had severely diseased vessels, he had a blood vessel which was very largely occluded, almost plugged up, so that there was a very limited amount of blood that could get through that area. So whenever he worked, or did any activity, when he did an activity which required more oxygen than that blood vessel was capable of giving he got angina. I used the term preinfarction angina, which is a condition wherein the heart muscle is going into oxygen debt, he is not getting enough blood to it for the activity he is doing. He has pain and this is sort of a crescendo effect, it builds up, and eventually that muscle is severely injured and dies. This is what I feel that he did.
>
> "* * * * *
>
> "Q. It seems plausible to me that the [work] activity did nothing more than give him a series of warning signals and did nothing to accelerate the infarction process. Am I all wrong in that or can you say with any definiteness that it did accelerate the infarction process?
>
> "A. I feel that it did. * * * Yes, it did in his case because it's such a classical story of activity, pain, activity, pain, activity, pain, until finally you get an infarction.

"Q. Even as late as this infarction was?

"A. Yes, that's not unusual.

"* * * * *

"* * *—Let me put it this way: He would have had that myocardial infarction when he stressed his heart as much as he did regardless what he had been doing. He could have been bouncing tennis balls. It was—the infarction was precipitated by the demand by—by the demand exceeding the ability of his right coronary artery to supply [oxygen to the] muscle.

"* * * * *

"Q. Can you say with any degree of medical certainty that his work activity as contrasted with whatever other activities he engaged in on that day caused this attack to occur an hour or five hours or a day or two days before it was going to occur?

"A. I have to believe that doing that contributed. I mean that is just too much work for what he had, for his ability, for his reserve. He couldn't get that much blood through. I would have to believe this contributed, that it aggravated it."

■ Like the referee, Board and circuit court we find Dr. Brown's testimony to be sufficiently persuasive to meet the burden imposed upon claimant. As Dr. Brown indicated, the evidence suggests that any strenuous exercise by claimant at all on February 22 would have probably precipitated the infarction; that claimant did in fact exert himself while working that day is undisputed. In a sense the fact that claimant's injury is compensable is somewhat fortuitous; had February 22 been a holiday for claimant, and had he stayed home and exerted himself to the same extent it appears likely that he would have suffered the infarction. As it happened, however, the crucial exertion did occur in the course of claimant's employment—his injury is therefore compensable.

Affirmed.