Argued and submitted January 13, affirmed August 18, 1982

In the Matter of the Compensation of
James Thurston, Claimant.

THURSTON,
*Petitioner,*

*v.*

MITCHELL BROS. CONTRACTORS,
*Respondent.*

(WCB No. 79-09759, CA A22120)

649 P2d 605

Doug Vande Griend, Salem, argued the cause and filed the brief for petitioner.

Emil R. Berg, Portland, argued the cause for respondent. With him on the brief was Wolf, Griffith, Bittner, Abbott & Roberts, Portland.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Claimant appeals from an order of the Workers' Compensation Board reversing a referee's finding that his myocardial infarction was job-related. The issue is compensability. We review *de novo* and affirm.

Claimant, age 50, was employed as a truck driver. At noon on February 20, 1979, he left home to load his truck in Tacoma for a haul to San Francisco. On reaching Tacoma at 2 p.m., his first task was to strap and tie down his load. That process took from 20 to 30 minutes and was physically demanding, causing him to sweat and to breathe heavily. He began driving from Tacoma at about 3 p.m. On reaching Tumwater at about 4 p.m., he repeated the load-tying process. He then drove to Coburg, Oregon, where he stopped at about 9 p.m. During the trip from Tacoma to Coburg, he stopped and tightened his load at least three times.

Claimant began feeling chest pains about 30 to 60 minutes after leaving Tumwater.[1] Initially, it felt like indigestion and back strain, but grew in intensity. Between 6 and 7 p.m., the pain became very acute. He was unable to get to sleep until 2:30 to 3 a.m. the next morning.

On February 21, claimant continued to drive. Beginning at 8 a.m., he drove about ten hours. His chest pain continued. By 8 p.m. the pain had increased so much that he entered a hospital in Fairfield, California, where he was examined by Dr. Robinson. Later, he was transferred to the care of Dr. Parkinson. With one exception, the histories taken by the doctors are similar.[2] Dr. Robinson reported:

> " * * * [Claimant] reports that for the past several years he has had intermittent episodes of sharp, stabbing chest pain, occasionally radiating to the back or to the left arm. These have been brought on most frequently by exercise, occasionally by large meals but not by exposure to colds or anxiety. He reports that since 9 o'clock yesterday morning,

---

[1] He had suffered similar pains in 1976 or 1977. On that occasion, claimant had rested at a motel, because he had no schedule to meet.

[2] Dr. Robinson reported that claimant said he had suffered persistent chest pain "since 9 o'clock yesterday morning (February 20)." Claimant checked into the hospital about 8 p.m. on February 21. Dr. Parkinson reported that claimant said his difficulty "began 24 hours ago when he experienced quite marked pain * * *."

he has had persistent chest pain, again described as sharp and stabbing with radiation into the back, intermittently associated with nausea and diaphoresis. It was not specifically aggravated by difficulty while driving but tonight he felt an increase in pain that made him feel it was impossible for him to continue. He has a strong family history for myocardial disease, his parents died in their mid 60s of heart attacks, his maternal grandfather has diabetes. He at one time weighed 310 pounds and now is in his mid 250s. He reports playing semipro baseball as a young man but recently has had one block exertional pain and had to stop working as a construction worker because of chest discomfort. * * *"

Dr. Parkinson's history indicated:

" * * * His current difficulty began 24 hours ago when he experienced quite marked pain between his shoulder blades, radiating through into the epigastric area, associated with substernal pressure achy feelings and pain radiating down the left arm and some pain radiating to the right jaw. * * * He noted a similar type pain 3 days ago but it was of shorter duration and had disappeared by the following morning and he had no pain during the next 2 days. Ten days ago while in Portland after eating a heavy meal, he had similar type pain. He relates that he has had this same type of discomfort and the same pain complex as far back as 1972. * * * In 1972, he saw a chiropractor about this but has not actually seen a physician about this pain since its onset. * * * Several years ago he weighed 300 pounds but more recently he has weighed between 250 and 260 pounds. * * *"

Claimant was released from the hospital on March 6. Dr. Parkinson's final diagnosis was:

"1 - Acute inferior wall myocardial infarction.

"2 - Arteriosclerotis heart disease with prior anteroseptal myocardial infarction and with subsequent episodes of angina and probable cardiomyopathy.

"3 - Cardica rhythm disturbance with episode of acute ventricular tachycardia and subsequent episodes of multifocal PVC's secondary to §1 and §2 occurring during hospital course.

"4 - Episode of acute congestive heart failure with pulmonary edema secondary to §1 and §2.

"5 - Newly discovered diabetes mellitus."

Claimant then came under the care of Dr. Feld, an internist.

Employer's insurer retained Dr. Rush, a cardiologist, to analyze the case for compensability. In August, 1979, he wrote:

"From the information available, it would be my opinion that Mr. Thurston's myocardial infarction was not related to his employment nor accelerated by it. It appears that he had had coronary disease probably for five to seven years with an old, probably anteroseptal infarction. The myocardial infarction that resulted in his hospitalization on February 21, 1979 was most likely due to the progression of his coronary artery disease in an individual with multiple risk factors including obesity, diabetes and cigarette smoking."[3]

The insurer sent a copy of Dr. Rush's report to Dr. Feld, who had been treating claimant since his release from the hospital. Dr. Feld replied that he essentially agreed with Dr. Rush's hypothesis. The insurer then denied the claim and claimant requested a hearing on the issue of compensability.

Dr. Rush examined claimant in February, 1980, and reviewed the medical records. He found him to be "markedly obese" and diabetic. He concluded:

"I find nothing on examining him to change my opinion as stated in my letter of August 23, 1979. This is that the myocardial infarction that occurred was related to the progression of his coronary disease which had most assuredly been present since at least 1972."

In May, 1980, Dr. Feld wrote claimant's attorney:

" * * * regarding the role of Mr. Thurston's work on his development of a heart attack on February 21, 1979:

"1) Mr. Thurston's work was probably a causal factor in the attack.

"2) Mr. Thurston's work was not a primary or predominant factor in the attack.

---

[3] Dr. Rush did not have an opportunity to study claimant's hospital EKG records before he wrote his August, 1979, opinion letter. However, prior to the hearing, he reviewed those records and concluded that they supported his hypothesis.

"3) I am unable to quantify the amount of significance that the work was to the attack except as above."

Prior to the hearing, Dr. Grossman, an internist who treats a large number of cardiac patients, was retained by claimant for purposes of diagnosis. After examining claimant, and having reviewed all the medical reports, including those from the hospital, he reported:

"The sequence of events indicates that Mr. Thurston's myocardial infarction was work related and that the work activity of 2/20/79 including emotional strains did in fact contribute significantly to triggering of the (1st?) attack which probably started developing in the late work hours of 2/20/79, finally culminating in complete occlusion of the coronary artery while eating dinner at 6:15 p.m. on that day."

" * * * * *

"Ideal care would have meant immediate hospitalization and bed rest. In the absence of this and with continued work activity of 2/21/79, it is probable that the activity aggravated his condition on that day and was responsible for increasing the area of infarction, or in the alternative, precipiated a second coronary occlusion in the evening of 2/21/79 with increasing steady pain which forced him to seek hospitalization."

Acknowledging claimant's pre-existing coronary arteriosclerosis and the existence of factors predisposing him to heart attack, Dr. Grossman concluded:

"In any case there was a sequence of events which clearly implicate his work activity in the triggering of his coronary thrombosis and myocardial infarction on 2/20/79, and the continued activity aggravated his infarction by increasing its size or triggering a second occlusion."

Both Dr. Rush and Dr. Grossman testified at the hearing. Each adhered essentially to the opinion expressed in his written reports. Dr. Rush's pre-hearing reports did not speak to the issue of aggravation. At the hearing he testified:

"Q. Can you conclusively say, assuming that Mr. Thurston did have an infarction in the afternoon, evening of the 20th, that his work activity of the 21st did not aggravate the situation that was already there?

"A. No.

"Q.  Can you say that it's more likely than not that he did not aggravate it?

"A.  It's my opinion that the work was not a major contributing factor to his infarction. And that his activity on the 21st did not materially make his infarction bigger by the means we have of measuring this.

"Q.  You indicated that it was not a major contributing factor. Was it a minor contributing factor?

"A.  I have no way of knowing that."

The referee said:

"Considering the testimony of both Dr. Grossman and Dr. Rush, I find Dr. Grossman's explanation of the cause of the claimant's heart attack the more persuasive. I find that claimant's work activity was a material contributing cause of the myocardial infarction which he experienced and his subsequent hospitalization and need for treatment."

The referee ordered that the claim be accepted by the insurer. On review, the Board reversed:

"The Referee found Dr. Grossman's explanation of the cause of claimant's heart attack the more persuasive. We do not. We find Dr. Feld's opinion of little value except to observe that his opinion is essentially 'neutral' on the question of causation—at one point he concurs with Dr. Rush's opinion of no relationship and at another point, absent any reason for the shift, he makes the statement that he does not know to what extent claimant's work contributed to the myocardial infarction.

"We are thus faced with two medical opinions, diametrically opposed on the question of medical causation. We are more persuaded by the opinion of Dr. Rush because (1) he is a cardiologist, Dr. Grossman is not; (2) his opinion seems to be more logically developed than does that of Dr. Grossman; and (3) his opinion is more consistent with and is supported by the history obtained at Intercommunity Hospital than is the opinion of Dr. Grossman."

■ ■  To prove a compensable heart attack, claimant must establish both legal and medical causation by a preponderance of the evidence. *Coday v. Willamette Tug & Barge,* 250 Or 39, 48, 440 P2d 224 (1968); *Batdorf v. SAIF,* 54 Or App 496, 498, 635 P2d 396 (1981); *Harris v. Farmers' Co-op Creamery,* 53 Or App 618, 621, 632 P2d 1299, *rev den*

291 Or 893 (1981). If an injury has sufficient work relationship, then it arises out of and in the course of employment and the statute is satisfied. *Rogers v. SAIF,* 289 Or 633, 643, 616 P2d 485 (1980).

■ ■  In determining legal causation, the question is whether claimant exerted himself in carrying out his job, a fact question. Usual exertion in claimant's employment is sufficient to establish the necessary legal causal connection. *Clayton v. Compensation Department,* 253 Or 397, 454 P2d 628 (1969); *see also Coday v. Wil'amette Tug & Barge, supra; Bales v. SAIF,* 57 Or App 621, 646 P2d 83, *rev allowed* 293 Or 28 (1982); *Carter v. Crown Zellerbach Corp.,* 52 Or App 215, 627 P2d 1300, *rev den* 291 Or 368 (1981). We conclude that claimant exerted himself in carrying out his job. Thus, legal causation is established. *See Rogers v. SAIF, supra,* 289 Or at 643; *Batdorf v. SAIF, supra,* 54 Or App at 500.

■  In determining medical causation, which is the difficult issue here, the question is whether the exertion connected with claimant's employment was a material contributing factor to the heart attack, a fact question requiring expert evidence. *Batdorf v. SAIF, supra; Harris v. Farmers' Co-op Creamery, supra; Carter v. Crown Zellerbach Corp., supra; Foley v. SAIF,* 29 Or App 151, 562 P2d 593 (1977); *Summit v. Weyerhaeuser Company,* 25 Or App 851, 551 P2d 490, *rev den* (1976).

Dr. Grossman reported that claimant's heart attack was precipitated by his work activities and that his work activities on February 21 probably aggravated the damage done by the heart attack. On the other hand, Dr. Rush testified that claimant's work was not a material contributing factor to his heart attack and did not materially make the attack worse.

■  On *de novo* review, ORS 656.298(6), we must determine whether claimant has sustained his burden of proof. The medical evidence is in conflict. The fact that Dr. Rush is a cardiologist and that Dr. Grossman is an internist who treats a large number of cardiac patients is not dispositive. *See Costello v. Georgia-Pacific Corp.,* 28 Or App 795, 799-801, 561 P2d 654 (1977) (internist found more

persuasive than cardiologist). Neither physician was a treating doctor, and therefore we can not rely on the premise than a treating physician is more credible than a consultant. *But see Hammons v. Perini Corp.,* 43 Or App 299, 602 P2d 1094 (1979) (consultant found more persuasive than treating physicians).

As triers of fact, we conclude that Dr. Rush's hypothesis is more persuasive and that claimant has failed to prove medical causation by a preponderance of the evidence. While it is not dispositive, we are influenced to some extent by the fact that Dr. Rush is a specialist in cardiology. We also conclude that his opinion is more consistent with and is supported by the histories obtained by Drs. Robinson and Parkinson. We agree with the Board that Dr. Feld's opinions are, at best, "neutral" on the issue of medical causation.

Affirmed.