Argued February 3, reversed and remanded May 21, 1969

## CLAYTON, *Appellant, v.* STATE COMPENSA-TION DEPARTMENT, *Respondent.*

454 P2d 628

*John J. Haugh,* Portland, argued the cause for appellant. With him on the briefs were Tyler E. Marshall and Pozzi, Levin & Wilson, Portland.

*Clayton Hess,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Robert Y. Thornton, Attorney General, and Wallace Carpenter, Chief Counsel for State Compensation Department, Salem.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

O'CONNELL, J.

This is an action to recover widow's benefits and medical and funeral expenses under the Workmen's Compensation Act.[1] The claim arises out of the death of plaintiff's husband as a result of a heart attack suffered while acting within the course of his employment. The case was submitted to the jury which returned a verdict for plaintiff. Plaintiff appeals from a judgment notwithstanding the verdict.

At the time of his death plaintiff's husband, Herbert G. Clayton, was employed by Pittsburgh Plate Glass Company. He had started working for the company in 1954 after returning from military service. Clayton was off work during the fall of 1954 as a result of a condition diagnosed as "soldier's heart." The condition was characterized by chest pains, difficulty of breathing, and pain in the left arm. On April 30,

---

[1] Since the claim arose out of the death of plaintiff's husband on April 15, 1965, the case is governed by the Workmen's Compensation Act prior to the amendments made in the 1965 and 1967 legislative sessions.

1959, while driving home from a business call, Clayton experienced chest pains and radiation of pain down both arms. He was in shock and was hospitalized. He remained in the hospital until May 29, 1959 and did not resume work on a full time basis until October 6, 1959. After he returned to his job Clayton continued to consult his physician for treatment of respiratory infection, dyspnea and angina. During this period he regularly took nitroglycerine, digitalis, quinidine, penicillin, sparine and amytal.

In May of 1964 Clayton was assigned a new job in the company which required him to travel extensively in several states and soon he felt the pressure of the new assignment. He began working in the evenings and on weekends. His wife testified that his new job "was a tremendous load on him. He was very tired. Very conscientious with his job and trying to do a good job." She described her husband as a "perfectionist." During the week preceding his death he had been travelling in connection with his job. When he returned home he was "extremely tired" according to his wife's testimony. She was asked, "Did excitement have any effect upon your husband's condition," to which she replied, "Yes, it would bring on an angina condition, severe chest pains." A fellow employee when asked if there were pressures to which Clayton was subjected in the new job testified as follows:

"A Well, there certainly would not be physical pressures—at least not from what I have seen—but mental pressures, correspondence and a lot of telephone calls and this type of thing, intercompany and also accounts and then the traveling. I know he was quite upset when I talked to him from time to time, particularly, with all of the correspondence he had to do. When he had the secretaries, at the factory this helped the problem con-

siderably but then he lost his secretaries and he told me many times that he was doing all of this either at home or on the road and he would work until 10:00 or 11:00 o'clock at night."

He further testified as follows:

"Q Did Mr. Clayton ever show or express his anxiety or concern over his job security?

"A Well, yes, in this sense, that if he more or less didn't make it because he was aware of his heart condition, he couldn't find employment with other companies and he was a little concerned in the sense that if he didn't make a success of this, then what would happen to him."

On April 15, 1965 decedent suffered a fatal heart attack while he was on the job.

■ The foregoing evidence was ample to show a causal connection between the decedent's employment and the stress and fatigue which he suffered. The crucial question, however, is whether the stress and fatigue was a causal factor in producing decedent's heart attack. Thus, we are again presented with the very difficult problem of deciding what constitutes sufficient proof of medical causation.

The only medical witness was Dr. Herbert Griswold, Jr., who was called by plaintiff. His testimony was related to a hypothetical question embodying the facts recited above. The material part of Dr. Griswold's testimony was as follows:

"THE WITNESS: * * * I really don't know in this particular case if it was attributable. * * * [I]t may well have contributed; certainly they have a pattern. * * * [T]his work pattern, as defined in the hypothetical question, was not desirable in a man that has a serious heart disease.

"This man had a serious heart disease. He not only had heart attacks, but he had heart failure. For

me to state—I feel in all probability that this activity did contribute to his death on that particular day—is something I can't honestly—can't quite do. I just don't know.

"* * * * *

"A All I can say is that it may very well have done so but I can't say it probably did. The reasonable probability is that more chance that it did than it didn't.

"* * * * *

"A * * * The medical profession doesn't understand how stress may or may not contribute to such an episode.

"* * * * *

"A * * * Such individuals have this pre-selection—but interestingly enough, when under stress * * * they tend to handle this differently than a person who does not have coronary artery disease * * *. When they are under stress, the blood lipids in their blood viscosity changes and their platelets are involved in clotting changes such that they become abnormally sticky.

"* * * * *

"A * * * We know an arterial blood clot is formed by platelets which are cells in the blood stream piling up. It isn't the ordinary blood clot you get out of the vein or in a test tube. It's a particular type of blood clot and this platelet or glutination or gumming together may come about after a fatty meal. It may come about following stress. Both of them will precipitate it and these platelets may then occlude in these instances where this is the primary cause of the heart attack.

"* * * * *

"A I am saying that in a group of people susceptible to coronary artery disease, stress probably is a factor, but in any single individual, it's difficult to say. * * * [W]e are not certain if you remove them from a stressful situation, whether or not they would live longer, * * *.

[T]he * * * experiment of taking a group out and leaving them in a stressful situation has never been done.

"I would say that most physicians feel that such individuals as Mr. Clayton, that it was more desirable that he should not be in a stressful situation. And the hope being that possibly he might do better and live longer."

The trial court decided that this testimony was not sufficient to present a jury question on the issue of causation.

■ The question of the sufficiency of evidence to warrant submission of a case to the jury is difficult enough in any area of the law. In the heart attack cases the difficulties are multiplied because the medical authorities themselves are not agreed upon the basic question of whether stress of any kind can be a precipitating factor in causing a heart attack. We are not certain which of these conflicting theses is right but since we must proceed upon the basis of a uniform rule a choice must be made. We have chosen to reject the view that exertion or stress can never be a causative factor in these cases.

Once this step is taken the question remaining is whether the work-related stresses in the particular case at issue were a causal factor in the heart attack which ensued. This presents difficulties of proof. In the first place even where the medical witnesses on both sides agree on the general thesis that exertion and stress can cause heart attacks, these witnesses may have different theories as to the physiological processes which must occur in order to produce a heart attack through physical exertion or emotional stress. These differences in medical viewpoint usu-

ally do not come out in the testimony.[2] Moreover, whichever theory of the physiological process the medical witness takes he cannot demonstrate whether that process did or did not occur *in the particular case*. The expert's conclusion is arrived at not on the basis of what occurred within the body of the particular person who suffered the attack but by drawing an inference from the general data of medical science. The process has been described as follows:

. "Causation is determined, not as a matter of clinical fact but mainly as a matter of implication of law. The reason for this is that the gap between the medical theory that it is 'possible' for a heart injury to result from exertion, and the necessary finding (by a preponderance) that the particular injury was 'probably' caused or contributed to by ordinary work effort, is bridged by the acceptance of opinion evidence without reasonably complete clinical data." The Industrial Heart Case, 85 N J L J 244 (May 3, 1962).

■ The process can be described more specifically as follows. In making a diagnosis the doctor draws upon the conclusions of medical science demonstrating that certain diseases can be traced to certain causes.

---

[2] The problem is well stated by Mr. Chief Justice Weintraub in a concurring opinion in Dwyer v. Ford Motor Co., 36 N J 487, 178 A2d 161 at 176 (1962), noted 29 NCAA L J 223 (1963): ı .
"It may well be that the ultimate opinions of these experts hinged upon doctrinal differences with respect to minimum criteria necessary to show medically that a causal connection existed. Neither witness was interrogated along these lines. Perhaps if it were developed that the profession is divided upon the subject and there were an extensive discourse upon the contending theories with the scientific support for them, I could make an informed choice. On the present record, I think I must start with the agreed proposition that the work effort could have played a part, and superimposing the day's work upon the grievous illness, I get the feeling that decedent probably became the worse for it. Thus I concur in the result reached by the majority."

These conclusions are not stated in absolutes; they are expressed in terms of probabilities. From the empirical study of many cases medical science can say that if certain symptoms are present there is a probability that certain disease is present. The probability is stronger in the identification of some diseases than it is in others, depending upon what has been learned about the causes for the particular disease. The diagnosis in a particular case involves the reasoning that since this probability has been established in cases in general the probability exists in the particular case being diagnosed.⑧ In the absence of evidence showing that the particular case in issue is distinguishable from cases in general it must be accepted that where medical science finds a probable causal relationship for the general group probable legal cause is established for the particular case being litigated.

When all heart attack cases are taken together it is easy enough to think of any single case in the group as being governed by the same probability that governs the whole group. However, if a particular heart attack is looked at alone and not as a part of a statistical sample it is difficult, indeed impossible, to say that the attack was caused by any one factor such as exertion or stress. The most that could be said in such a case is that the exertion, stress or any other single factor was a *possible* cause. The fact that the cause can be described only as a possibility when the heart attack is viewed as an isolated case does not

---

⑧ The reasoning process is not unlike that involved in applying the res ipsa loquitur doctrine: If an automobile veers off the highway and there is no evidence explaining why it did we permit the jury to conclude that because automobiles normally do not ordinarily veer off highways unless the driver is negligent it may be inferred that the driver was negligent in the particular case.

render invalid the inference of probability based upon the generality of cases.

The difficulty which we have taken pains to explain has been seen in other cases. Thus Mr. Chief Justice Weintraub concurring in *Dwyer v. Ford Motor Co.*, 36 N J 487, 178 A2d 161 at 176 (1962) observed:

"* * * I appreciate regretfully that my reaction to this factual complex can be of no help in another case. It is but a gross reaction rather than a demonstrable product of a step-by-step analysis. When the possibility of causal connection is accepted, we cannot deny relief in all cases simply because science is unable decisively to dissipate the blur between possibility and probability. In such circumstances judges must do the best they can, with the hope their decisions square with the truth, and with a willingness to consider in succeeding cases whatever contribution scientific advances may offer."[4]

It is apparent from the record in the present case that Dr. Griswold was attempting to express his opinion as to the "probability" or "possibility" of the cause of Clayton's heart attack upon the basis of the distinction we have just explained.[5]

---

[4] Chief Justice Weintraub then added:

"This rough basis for decision is not a happy one. A process which leads to an all-or-nothing result in so murky an area is not truly just either to the individual litigants or to the larger interests in the industrial scene. It may well be that until the medical profession can give us dispositive help, some arbitrary compromise would be the more tolerable course. This must be left to the other branches of government which alone can fashion a remedy of that quality."

[5] Thus he testified:

"I am saying that in a *group* of people susceptible to coronary artery disease, stress probably is a factor, but in any single individual, it's difficult to say. * * * I really don't know in this particular case if it was attributable. * * * All I can say is that it may very well have done so but I

■ In essence Dr. Griswold expressed the opinion that stress can be a cause of heart attack and that since Clayton was subject to stress it could have been a factor in causing the heart attack in this case. This was sufficient to present a jury question on the issue of medical causation. The observations in 2 Larson, Workmen's Compensation Law § 80.32, p. 322 (1968) on "[i]nterpreting cautious medical testimony" are appropriate at this point. There it is said:

"The distinction between probability and possibility should not follow too slavishly the witnesses'

can't say it probably did. The reasonable probability is that more chance that it did than it didn't." (Emphasis supplied.)

That plaintiff's counsel was also aware of the distinction we have discussed is evident from the following questioning.

"By MR. WILSON:

"Q Doctor Griswold, in medical science as far as making diagnoses and prognoses, does not the medical profession often diagnose or prognose based on statistics?

"A Yes.

"Q For example, isn't there some statistical facts in medical science that a child at birth who weighs over ten pounds is a candidate—and will be in 100 percent of the cases—a diabetic?

"A The child?

"Q Yes.

"A No. Well, it's more possible that the mother may develop diabetes.

"Q It's one or the other, but it's 100 percent?

"A No. It's not 100 percent but probably—

"Q (Interposing) The event isn't known, but this is a statistical diagnosis and prognosis; isn't it true?

"A Yes.

"Q And when you talk about other fields of medicine which have not advanced to the point of being certainties, then you also diagnose based upon statistics?

"A Yes.

"Q Therefore, then you say it's difficult to diagnose to any particular factual situation in any individual patient, is that what you have reference to, Doctor?

"A Yes."

For a case involving similar medical testimony see Holman v. Standard Oil Co. of Kentucky, 242 Miss 657, 136 So2d 591 (1962).

choice of words, as sometimes happens in respect to medical testimony. A doctor's use of such words as 'might', 'could', 'likely', 'possible' and 'may have', coupled with other credible evidence of a non-medical character, such as a sequence of symptoms or events corroboating the opinion, is sufficient to sustain an award. It is a common experience of compensation and personal injury lawyers to find that the more distinguished a medical witness is, the more tentative and qualified are his statements on the witness stand. * * * The weight of such testimony, however, should not be too sharply discounted because of the disposition of the highly-trained scientific mind to refrain from unqualified statements or opinions on such matters as causation."

Because medical opinion on the effect of exertion and stress in heart attack cases rests upon such limited scientific knowledge there is reason to question the fairness of our present system of determining the issue of medical causation in these cases. However, until the legislature provides a more effective method of dealing with the heart attack cases under workmen's compensation we see no other way of solving the problem.⊛

The judgment is reversed and the cause is remanded with directions to enter a judgment on the verdict.

---

⊛ Suggestions for legislative change have been made. For example, see The Industrial Heart Case, 85 N J L J 244 (May 3, 1962) and Standards of Proof in the Heart Cases—The Dwyer Doctrine, 16 Rutgers L Rev 754 (1962).