Argued December 19, 1973, reversed and remanded February 5,
reconsideration denied February 27, petition for
review denied March 19, 1974

VOLK (No. 392-534), *Appellant, v.*
BIRDSEYE DIVISION, *Respondent.*

518 P2d 672

*Raymond Conboy,* Portland, argued the cause for appellant. With him on the briefs were Pozzi, Wilson & Atchison and Dan O'Leary, Portland.

*Noreen K. Saltveit,* Portland, argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

FORT, J.

This workmen's compensation case arises out of an accident which occurred August 25, 1971. The employer's carrier denied the claim. The hearing officer allowed it. The Workmen's Compensation Board, by a 2-1 vote, reversed the hearing officer, and the circuit court, without opinion, affirmed the board. Claimant appeals.

A statement of the facts is necessary to an understanding of the issues.

Claimant, age 34, was employed as a trimmer by Birdseye Division. On August 25, 1971, while working on unprocessed broccoli, she sustained injury when some broccoli was thrown into her eye as it was passing along the conveyer belt. Her work, which was the first step in processing the broccoli, consisted of cutting the raw broccoli into spears as it came by her on the conveyer belt and separating the best from the unsuitable pieces of broccoli. Claimant worked in a seated position with her face close to the conveyer belt. Another conveyer belt crossed this one at a slight elevation at the point where claimant was working. The accident occurred when a large mass of broccoli traveling along the conveyer belt got hung up on the second conveyer belt, causing it to splash up into claimant's face. The broccoli had a white powdery substance on it which was never positively identified. She experienced a burning sensation in her eyes, particularly in the right eye.

She went immediately to the plant nurse, who testified that on that date, claimant came to her office with a foreign body in her right eye. The nurse cleansed claimant's eyes and applied some medication to the right eye and an eyewash to the left eye. Some

blurring of vision began to develop the following day. On August 30, 1971, claimant returned to the nurse who noted the eye was still watering. A simple eye test performed on that date indicated that claimant had "poor vision" in both eyes.

On August 31, 1971, claimant saw her own physician. He saw her five more times in September. When the eyes did not clear sufficiently, she was examined by an eye specialist on October 1, 1971. At that time claimant's vision was greatly reduced. Her visual acuity was 20/400. She was able to count fingers only at three feet. The doctor concluded:

> "Although, in my opinion, the etiology of this process cannot be unequivocably related to the injury with broccoli, circumstances indicate this to be a possibility at least."

She was referred by the specialist, Dr. Peterson, to the University of Oregon Medical School where she was examined by other specialists in the ensuing months.

It is agreed that uveitis is the name of the medical condition from which claimant suffers. The expert evidence establishes, so far as this case is concerned, that this is a medical condition of unknown etiology.

The evidence also established that prior to the accident of August 25, 1971, she was aware of no vision problem and did not wear glasses, although she had had periodic eye checkups.

Although the precise nature of the white, powdery substance on the broccoli was not positively identified, it was not seriously disputed that broccoli coming into the plant frequently had been treated with chemical sprays in the growing process.

Dr. Wendel, an M.D. and associate professor of pharmacology at the University of Oregon Medical School testified:

"My opinion is there is reasonable medical conclusion or reasonable medical probability that eye injury and eye disease was caused or is causably connected with this accident, the injury she suffered on August 25, 1971."

In the course of a rigorous cross-examination, Dr. Wendel pointed out:

"No, I would still say to me actually it is not scientific, it is common sense reasoning. It is so clear, the connection between what has happened and the eye trouble. It flew into her eye. There was an immediate reaction of the eye. It is not illogical to assume, to conclude that it developed further. * * *"

There were other medical experts who expressed varying opinions. All agreed generally that the cause or causes of uveitis were not presently known to medical science. Some expressed the view that Mrs. Völk's condition was not caused by the accident regardless of the presence of any of certain chemicals which, from the testimony, might have been present on the particular broccoli which struck claimant.

Employer-respondent here denied that it was responsible for the uveitis condition on the ground that claimant had failed to show that it was caused by the on-the-job injury.

*Larson* points out:

"To appraise the true degree of indispensability which should be accorded medical testimony, it is first necessary to dispel the misconception that valid awards can stand only if accompanied by a definite medical diagnosis. True, in many instances it may be impossible to form a judgment on the

relation of the employment to the injury, or relation of the injury to the disability, without analyzing in medical terms what the injury or disease is. But this is not. invariably so. In appropriate circumstances, awards may be made when medical evidence on these matters is inconclusive, indecisive, fragmentary or even nonexistent.

"One of the best opinions on this subject is that in a Rhode Island case, in which the undisputed testimony of claimant showed that she had been struck a sharp blow on the nipple of the left breast by a bobbin, that about two weeks later a lump had formed at that exact spot and pus was beginning to come off, and that shortly after, on the advice of doctors, the breast was removed. The award was attacked on the ground that there was no direct medical testimony fixing the pathological nature of the condition that necessitated the operation, and no medical testimony connecting the blow with the growth. The Supreme Court of Rhode Island rejected this argument and ordered an award to be made. As to the necessity of medical diagnosis in the record, the court said:

" 'The first contention, as stated, if literally followed would turn a compensation case into a clinic where doctors seek to determine the "diagnosis" of a patient's ailment and the "pathological nature" of that condition according to the more exacting norms of medical science. The application of so strict a rule to establish the required causal relationship in the field of law, where the ultimate objective is the attainment of substantial justice according to the remedial purposes and provisions of the act, would cast an unfair burden upon a person injured by accident.'

"The court continued, on the subject of the lack of medical testimony on causation, as follows:

" 'We concede that in the great majority of cases, such testimony ordinarily is necessary be-

cause of the seeming absence of connection between a particular accident and a claimed resulting injury. But in other cases involving special and peculiar circumstances, medical evidence, although highly desirable, is not always essential for an injured employee to make out a prima facie case, especially if the testimony is adequate, undisputed and unimpeached. Thus where, as in the instant case, injury appears in a bodily member reasonably soon after an accident, at the very place where the force was applied and with symptoms observable to the ordinary person, there arises, in the absence of believed testimony to the contrary, a natural inference that the injury, whatever may be the medical name, was the result of the employment.' " 3 Larson, Workmen's Compensation Law 180-85, Award Without Definite Medical Testimony § 79.51.

In *Uris v. Compensation Department,* 247 Or 420, 426, 427 P2d 753, 430 P2d 861 (1967), the court said:

"In the compensation cases holding medical testimony unnecessary to make a prima facie case of causation, the distinguishing features are an uncomplicated situation, the immediate appearance of symptoms, the prompt reporting of the occurrence by the workman to his superior and consultation with a physician, and the fact that the plaintiff was theretofore in good health and free from any disability of the kind involved. * * *"

The Supreme Court of Tennessee recently considered an eye injury case in *Bowser-Briggs, Inc. v. Bennett,* 224 Tenn 565, 458 SW2d 792, 794 (1970). It said:

"In sum, we have here a case of a man who could see before suffering an industrial accident in which a strong, burning acid is splashed on his body and in his eye. Following the accident he is found to be blind in the affected eye. Upon exam-

ination, the cornea, which is the 'transparent part of the coat of the eyeball which covers the iris and pupil and admits light to the interior', Webster's New International Dictionary, Second Edition, page 593, is found to be in a damaged condition in that it is cloudy. In other words, the 'window-pane' of the eye is in such a condition as not to freely admit light. More: there is no evidence the cornea was cloudy before the accident. There is no other explanation for the cloudiness than the acid.

"* * * * *

"Being bound to draw from the evidence all inferences favorable to Bennett, * * * and being authorized to draw inferences from circumstantial evidence, * * * we conclude Bennett's loss of sight was caused by the strong acid splashed to his eye."

The Texas Court of Civil Appeals in *Texas Employers Insurance Ass'n v. Goodeaux,* 478 SW2d 865, 868-69 (Tex Civ App 1972) had before it a compensation case in which the workman was sprayed in the eyes by water from a cooler, which water contained sulphuric acid and hagatreet.

The court said:

"* * * Plaintiff's blindness was caused by hemorrhage. As we view the evidence, Dr. Johnson is not testifying a hemorrhage can only possibly be caused by an injury as plaintiff had, but that he is unable to definitely say whether *this hemorrhage* was caused by this injury. No particular words from the medical experts are necessary to create a probability. * * * [Citations omitted.]

"It is true Dr. Johnson said that other things such as diabetes, high blood pressure or occlusion of the central retinal vein could cause eye hemorrhage, but there is no evidence here that plaintiff had any of these conditions.

"From the very time of the injury here to the diagnosis of blindness by hemorrhage, there is a

direct sequence of events which in our opinion justified the jury in finding that the injury was the cause of the loss of sight. * * *" (Emphasis theirs.)

In *Clayton v. Compensation Department,* 253 Or 397, 405, 454 P2d 628 (1969), our Supreme Court dealt at length with the problem of medical causation in relation to job-related heart attacks. In the course of the opinion, it said:

"The difficulty which we have taken pains to explain has been seen in other cases. Thus Mr. Chief Justice Weintraub concurring in *Dwyer v. Ford Motor Co.,* 36 N J 487, 178 A2d 161 at 176 (1962) observed:

"'* * * I appreciate regretfully that my reaction to this factual complex can be of no help in another case. It is but a gross reaction rather than a demonstrable product of a step-by-step analysis. When the possibility of causal connection is accepted, we cannot deny relief in all cases simply because science is unable decisively to dissipate the blur between possibility and probability. In such circumstances judges must do the best they can, with the hope their decisions square with the truth, and with a willingness to consider in succeeding cases whatever contribution scientific advances may offer.'"

Here, the question is a close one under the evidence. We conclude, based upon the factual sequence outlined above and the presence of substantial medical opinion, that the claimant has established to our satisfaction a causal relationship between the on-the-job injury and the uveitis condition from which she now suffers.

Reversed and remanded.