IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 39039-2011

JOSEPH HENRY, )
                                                    )
             Claimant-Appellant, )
                                                      )
v. )
                                                      )
DEPARTMENT OF CORRECTION, )
Employer, and STATE INSURANCE FUND, )
Surety, )
                                                      )
            Defendants-Respondents. )

Boise, November 2012 Term

2013 Opinion No. 9

Filed: January 23, 2013

Stephen W. Kenyon, Clerk

Appeal from the Industrial Commission of the State of Idaho.

The order of the Industrial Commission is <u>affirmed</u>.

Richard S. Owen, Nampa, argued for appellant.

Bridget A. Vaughan, Special Deputy Attorney General, Boise, argued for respondents.

_____

EISMANN, Justice.

      This is an appeal from a decision of the Industrial Commission finding that the claimant had failed to prove that the heart attack he suffered while at work was an industrial accident because his cardiologist could not determine whether the plaque rupture that caused the heart attack was triggered by events occurring before or after the claimant arrived at work. We hold that the Commission's findings of fact are not clearly erroneous and affirm its order denying compensation.

## I.
## Factual Background.

      On November 15, 2009, Joseph Henry (Mr. Henry) suffered a heart attack shortly after arriving at his place of employment with the Idaho Department of Correction where he worked as a prison guard. He was transported by ambulance to the hospital and was diagnosed by a

cardiologist as having an "acute posterolateral myocardial infarction due to a blockage of the right circumflex obtuse marginal artery." The cardiologist performed emergency surgery to place a stent in the occluded artery. Ten days later, Mr. Henry suffered another cardiac event while undergoing a cardiac stress test, and the following day he underwent triple bypass surgery.

In April 2010, Mr. Henry filed a complaint with the Industrial Commission in which he contended that his heart attack on November 15, 2009, constituted an industrial accident. He also contended that the triple bypass surgery was related to the heart attack and that his heart attack exacerbated his preexisting anxiety disorder, rendering him totally and permanently disabled.

The parties had an evidentiary hearing before a referee, and on June 24, 2011, the referee issued proposed findings of fact and conclusions of law that Mr. Henry had failed to prove that his employment caused or contributed to his heart attack. The Commission adopted the referee's proposed findings and conclusions and issued an order that Mr. Henry had failed to prove he suffered an industrial accident. Mr. Henry then timely appealed.

## II.
## Did the Industrial Commission Apply the Wrong Burden of Proof as to Causation?

The issue in this case was the cause of Mr. Henry's heart attack. It is undisputed that he had preexisting medical conditions and activities that increased the likelihood that he would suffer a heart attack. His preexisting condition certainly would not preclude him from being awarded benefits under the worker's compensation law. "Compensation is recoverable where an employee's work . . . causes an accident which aggravates or accelerates a previous disease condition of the employee, and an employee must establish his employment *caused or contributed* to his injury—here the myocardial infarction." *Horner v. Ponderosa Pine Logging*, 107 Idaho 1111, 1114, 695 P.2d 1250, 1253 (1985). Mr. Henry argues that the Commission misapplied the law by requiring him to prove that his industrial accident was the sole cause of his heart attack and that his preexisting conditions were not a cause. As will be shown when discussing the sufficiency of the evidence to support the Commission's conclusion, Mr. Henry's assertion is incorrect. The Commission did not require that Mr. Henry prove that his heart attack was caused solely or even primarily by his employment. Rather, it found that he "failed to

2

establish to a reasonable medical probability that his heart attack was triggered by his activities at work on November 15, 2009."

### III.
### Are the Commission's Findings of Fact Supported
### by Substantial and Competent Evidence?

"When this Court reviews a decision of the Industrial Commission, it exercises free review over questions of law, but reviews questions of fact only to determine whether substantial and competent evidence supports the Commission's findings." *Eacret v. Clearwater Forest Indus.*, 136 Idaho 733, 735, 40 P.3d 91, 93 (2002). Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion. *Id.* Because the Commission is the finder of fact, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. *Id.* This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented. *Id.* Whether the Commission correctly applied the law to the facts is an issue of law over which we exercise free review. *Combes v. State, Indus. Special Indem. Fund*, 130 Idaho 430, 432, 942 P.2d 554, 556 (1997).

It is undisputed that prior to his heart attack, Mr. Henry had preexisting medical conditions that increased his risk of a heart attack. At the time of the heart attack, Mr. Henry was 54 years of age. He had suffered from chronic anxiety for about 14 years, and in 2004 he had been instructed to resume taking medication for hypertension that he had been prescribed in 2003. In 2001 he was diagnosed with sleep apnea and was subsequently prescribed a C-Pap device. In 2004 he was diagnosed with hypercholesterolemia with a total cholesterol level of 298; he was prescribed medication for that condition in 2006; and he had a cholesterol level of 328 on March 21, 2008. At the time of his heart attack, he had been smoking cigarettes for about 38 years and was smoking one and one-half packs a day.

On the day of his heart attack, Mr. Henry had preexisting atherosclerosis, with three different coronary arteries having some degree of stenosis due to the buildup of plaque. His right coronary artery was occluded, but it was being supported by collaterals from the obtuse marginal branch system. The occlusion of the right coronary artery was not then causing any symptoms. Mr. Henry's heart attack occurred when the obtuse marginal branch of the circumflex coronary

artery became occluded. He was transferred to the hospital, where he underwent a cardiac catheterization procedure and an angioplasty stent procedure. He spent two days in the hospital and fully recovered from that heart attack. A stress test conducted ten days after the heart attack revealed the right coronary artery occlusion, for which he underwent triple bypass surgery.

Mr. Henry's preexisting condition is not a bar to receiving benefits. "An employer takes an employee as it finds him or her; a preexisting infirmity does not eliminate the opportunity for a worker's compensation claim provided the employment aggravated or accelerated the injury for which compensation is sought." *Spivey v. Novartis Seed Inc.*, 137 Idaho 29, 33, 42 P.3d 788, 792 (2002). "Aggravation of a preexisting condition may constitute an injury if it is precipitated by an accident." *Painter v. Potlatch Corp.*, 138 Idaho 309, 312, 63 P.3d 435, 438 (2003). An "accident" is defined as "an unexpected, undesigned, and unlooked for mishap, or untoward event, connected with the industry in which it occurs, and which can be reasonably located as to time when and place where it occurred, causing an injury." I.C. § 72-102(18)(b). "The claimant must prove to a reasonable degree of medical probability that the injury for which benefits are claimed is causally related to an accident occurring in the course of employment." *Stevens-McAtee v. Potlatch Corp.*, 145 Idaho 325, 332, 179 P.3d 288, 295 (2008).

In this case, Mr. Henry's cardiologist was the only medical expert who testified regarding the causation of the heart attack. He explained that the heart attack was caused when preexisting atherosclerotic plaque in Mr. Henry's artery ruptured, which was the inciting event of a coronary thrombosis. The issue with respect to causation was whether the plaque rupture was causally related to Mr. Henry's employment.

The cardiologist testified that mental stress, anxiety, exercise, and cold weather can cause blood pressure to go up, which puts hemodynamic stress on the artery, and that "the hemodynamic stress and probably other factors that are hormonal related release of certain hormones during stress and anxiety can cause an atherosclerotic plaque to rupture." Prior to the hearing, Mr. Henry's attorney sent a letter to the cardiologist asking whether certain specified conditions that existed with respect to Mr. Henry's employment could have caused his heart attack. The conditions included mental stress, anxiety, physical exertion, and being in cold weather. The attorney described them in the letter as follows:

> Mr. Henry arrived for work on the morning of November 15, 2009, very early, about 6:30 a.m. Mr. Henry tells me that it was below freezing, dark and windy out at the state prison south of Boise.

4

Mr. Henry was late to work and got out of his car and walked quickly to the first building which Mr. Henry tells me is approximately 75 yo [sic] 100 yards away from the parking lot. By the time Mr. Henry got to the first administration building he did not feel very good, kind of had a general feeling of malaise, but had no specific symptoms.

Mr. Henry went in to the administration building where it was nice and warm and went through a check through process required by his employer. He then went back outside and walked as fast as he could another 450 yards to a second building. Mr. Henry tells me that he was late to work, worried about his job, and walked as fast as he could this last 450 yards in the cold weather.

By the time Mr. Henry got to the front door of the second building, he was sweating profusely and his co-workers immediately asked if he was alright. Mr. Henry indicates that he was taken to a break room and sat down. Over the next half hour, he continued to sweat profusely, his heart was racing, and these symptoms continually and gradually got worse. By 7:00 a.m., Mr. Henry notified his boss that he was pretty certain that he was having a heart attack and asked to be transported to the hospital.

The cardiologist responded by stating that "the temperature, the time of day, the activity level and the mental stress he was under, I think it is quite likely that those factors contributed to his myocardial infarction that day."

In his later deposition, the cardiologist explained that mental stress, anxiety, physical exertion, and being in cold weather were circumstances that could trigger a heart attack. He stated that the heart attack could have happened without such triggers and that one could never be certain that these circumstances were the trigger. However, he explained that "you can only make the conclusion that because the heart attack occurred on that day, and those activities were occurring at that time, and those events were occurring, that there has to be some contribution to that heart attack on that day." He added that the triggers were not the sole cause of the heart attack, but in his opinion they were contributors which were 50% responsible for causing the heart attack.

Respondents' counsel then asked the cardiologist to consider factors that were occurring prior to Mr. Henry's arrival at work. They were that Mr. Henry was aware he was running late before leaving his home in Caldwell, that he was anxious about getting to work on time, that his car was parked outside all night in the cold weather, and that he started the car and left for work without allowing it to warm up first. The attorney asked whether the cardiologist thought that any of those factors may have triggered the onset of the heart attack that morning. The cardiologist answered that those factors should have been considered, but he could not tell

whether the heart attack was triggered by them or by the circumstances that occurred after Mr. Henry arrived at work. He testified as follows:

> So is there a time when he's been exposed to the scenario that you described, is that leading up to or helping prepare for this occlusion, is this a contributor to it, it really becomes into fine points that are so difficult to be factual or scientifically based that you just can't distinguish that exact degree of contribution.
>
> We don't know what's going on inside that artery. Was that artery—had a small plaque rupture during that time when he first got in the car? Was it happening as he was driving? Was it little bits of splitting of that atherosclerotic cap? Were things beginning to develop back then?
>
> With any scientific certainty you can't answer that question. You can't say that you know that that was happening. What scientifically you can say is when the onset of symptoms occurred, the artery at that time did close, and the heart attack began at that time.
>
> But can you say where along the day or the day before what was the stressing his system, when was this—when was the inevitable day that this thing was going to happen? You have to look at it, I think, major stressors and minor stressors.
>
> And if you look at things, you know, the cold car, the cold steering wheel, the driving through traffic, were those stressors that were contributing? They likely could have been, should have been, you know, considered. But can you—how far can you dissect that down? That's where I get in trouble of dissecting down all those, you know, minute events that begin to occur.
>
> And I can't go that fine for you as you'd like me to be discerning which was the one, was it the cold car, the steering wheel, the traffic, the getting out? Certainly in his perception, at the time of my history taking with him, during the time of it and then subsequently going into more depth afterwards, he didn't relate to me those events. . . .
>
> So I can't pin that down to you in a certainty the preceding—earlier in the—preceding events earlier in the day what contributed to that, what percent. Very difficult for me to give you a discrete, scientifically based answer.
>
> . . . .
>
> For you to ask me what's the contribution of the cold morning getting in the car and the drive to Boise is for me too fine a point to be so accurate to give you an opinion on what contribution—I just can't give that.

The Commission interpreted the cardiologist's testimony as being able to identify when the blockage of the artery occurred because there was an onset of symptoms, but being unable to identify whether the plaque rupture that caused the blockage occurred as a result of stressors prior to Mr. Henry arriving at work or after he had arrived at work. The Commission stated:

> The sense that emerges from the quoted testimony is that blockage of the artery immediately leads to symptoms typically associated with a myocardial

6

infarction. Therefore, one can determine when the blockage occurred by looking to the onset of symptomatology. However, [the cardiologist] was much more circumspect about identifying the event or events which made the occurrence of the blockage inevitable. It is impossible, in other words, to say whether the inciting events that led to the plaque rupture occurred prior to Claimant's arrival on the premises, or subsequent thereto.

"The Industrial Commission, as the factfinder, is free to determine the weight to be given to the testimony of a medical expert." *Eacret*, 136 Idaho at 737, 40 P.3d at 95. "When deciding the weight to be given an expert opinion, the Commission can certainly consider whether the expert's reasoning and methodology has been sufficiently disclosed and whether or not the opinion takes into consideration all relevant facts." *Id.* The Commission found that the cardiologist "was unable to opine which of these [pre-arrival at work or post-arrival] activities/events made it inevitable that Claimant would suffer the November 15 thrombosis when he did."

Mr. Henry argues that the Commission erred because the cardiologist was clear and unequivocal in his testimony that the artery blockage occurred after Mr. Henry's arrival at work. Mr. Henry points to the following testimony: "I don't think that artery closed when he was getting in the car that morning or when he drove from Caldwell to Boise. I think it closed when he was walking up those stairs, and it hit him very suddenly." However, the issue of causation is not when the artery became blocked. It is when the plaque rupture occurred that ultimately caused the blockage.

In its opinion, the Commission stated that a pivotal issue of causation was "ascertainment of when the thrombosis actually occurred" because "if the circumflex artery blockage occurred prior to Claimant's arrival at the workplace, it is impossible to associate that event with his post-arrival activities." The Commission then discussed evidence that it stated suggested an onset of symptoms prior to Mr. Henry's arrival at work.[1] Mr. Henry contends that the Commission erred by relying upon such evidence to discount the cardiologist's opinion as to when the occlusion occurred.

---

[1] Mr. Henry testified that when he arrived at work an unnamed coworker had stated that he did not look well. Another coworker testified that after the heart attack, Mr. Henry told him that he was not feeling well when he came to work that day and that he should have paid attention to how he was feeling.

As stated above, the issue of causation hinges upon when the plaque ruptured, not when the occlusion ultimately occurred. Although the Commission stated that "there is also testimony of record which would suggest an onset of symptomatology prior to Claimant's arrival on the premises," it did not base its decision upon such testimony. After discussing it, the Commission stated, "Considering the totality of the evidence, even the fact of Claimant's worsened post-arrival condition ultimately fails to establish that the injurious event *which ultimately caused the blockage* occurred after Claimant arrived at the worksite." (Emphasis added.)

In this case, Mr. Henry had the burden of proving that the event which ultimately caused the blockage of his artery was work related. The Commission found that he had failed to do so because the cardiologist could not state that the plaque rupture—the event that ultimately caused the blockage—occurred at work. The Commission concluded its analysis by stating:

> In the final analysis, [the cardiologist's] testimony is insufficient to establish that Claimant's post-arrival activities were responsible for causing or contributing to the occurrence of Claimant's myocardial infarction. The evidence just as easily supports the proposition that it was something that happened prior to Claimant's arrival at the worksite that made his heart attack inevitable and caused it to occur when and how it did.

(Citation to the record omitted.)

The Commission determined that Mr. Henry had failed to prove that he suffered an industrial accident. An industrial accident is defined as "an unexpected, undesigned, and unlooked for mishap, or untoward event, connected with the industry in which it occurs, and which can be reasonably located as to time when and place where it occurred, causing an injury." I.C. § 72-102(18)(b). The plaque rupture certainly was "an unexpected, undesigned, and unlooked for mishap, or untoward event" and it certainly caused an injury—the blockage of the right circumflex obtuse marginal artery. However, to be an industrial accident, the accident must be one "arising out of and in the course of any employment covered by the worker's compensation law." I.C. § 72-102(18)(a). "The words 'out of' have been held to refer to the origin and cause of the accident and the words 'in the course of' refer to the time, place, and the circumstances under which the accident occurred." *Dinius v. Loving Care and More, Inc*., 133 Idaho 572, 574, 990 P.2d 738, 740 (1999). The Commission ultimately determined that Mr. Henry had failed to prove that the plaque rupture arose out of and in the course of his employment. It concluded that he "has failed to establish to a reasonable medical probability

8

that his heart attack was triggered by his activities at work on November 15, 2009." Its finding in that regard is not clearly erroneous.

The dissent tries to play cardiologist and provide testimony that Mr. Henry's cardiologist was unable to provide. The issue in this case is not when the heart attack occurred. The heart attack is the injury, and for Mr. Henry to be entitled to compensation there must have been an industrial accident that caused that injury. In this case, the accident would have to have been the rupture of atherosclerotic plaque. As the cardiologist testified: "When an atherosclerotic plaque ruptures, that is the inciting event of a coronary thrombosis. So anxiety, cold weather, physical activity, you have all the milieu in place to cause a coronary thrombosis to occur."

A thrombosis is the "intravascular coagulation of the blood in any part of the circulatory system," http://dictionary.reference.com/browse/thrombosis (accessed: January 17, 2013). The cardiologist did not testify as to how long after the plaque rupture it would have taken for the blood clot to form to the extent that it blocked the artery.

The cardiologist's opinion as to the cause of the heart attack was based upon the temporal relationship between known stressors and the occurrence of the heart attack. As to the cause of the heart attack, he testified that "you can only make the conclusion that because the heart attack occurred on that day, and those activities were occurring at that time, and those events were occurring, that there has to be some contribution to that heart attack on that day." When the cardiologist was informed that some of the stressors he identified occurred prior to Mr. Henry's arrival at work and was asked whether they could have triggered the heart attack, he said he could not answer that question with any scientific certainty. All that he could say is that the heart attack occurred after Mr. Henry arrived at work. His testimony was as follows:

> We don't know what's going on inside that artery. Was that artery—had a small plaque rupture during that time when he first got in the car? Was it happening as he was driving? Was it little bits of splitting of that atherosclerotic cap? Were things beginning to develop back then?
> With any scientific certainty you can't answer that question. You can't say that you know that that was happening. What scientifically you can say is when the onset of symptoms occurred, the artery at that time did close, and the heart attack began at that time.

What the cardiologist did not say after being informed of the stressors that existed prior to Mr. Henry's arrival at work is significant. The cardiologist did not exclude as a possible cause of Mr. Henry's heart attack the stressors that were occurring prior to Mr. Henry's arrival at work.

9

He did not state that those stressors occurred too long before the onset of symptoms to have precipitated the plaque rupture. He did not, as asserted by the dissent, reaffirm his prior opinion that the cause of the heart attack was work-related. All he could say with any scientific certainty was that the heart attack occurred after Mr. Henry arrived at work.

The hearing officer was not required to determine the cause of Mr. Henry's heart attack. Mr. Henry was required to prove the cause by producing expert testimony showing that the plaque rupture was an industrial accident. His cardiologist did not so testify after he was informed of the stressors that existed prior to Mr. Henry's arrival at work. Although the dissent is willing to read between the lines and infer opinions not actually rendered by the cardiologist, the hearing officer was not required to do so.

## IV.
## Conclusion.

We affirm the order of the Industrial Commission, and we award respondents costs on appeal.


Justices W. JONES and HORTON **CONCUR.**


J. JONES, Justice, dissenting.

I dissent from the Court's opinion for two reasons—the Commission erred in disregarding the uncontradicted testimony of Dr. Parent as to the cause of Henry's heart attack and the Commission's findings on the issue of causation are clearly erroneous. Dr. Parent testified as to the factors that can precipitate a heart attack and how those factors precipitated Henry's heart attack while he was at work. The Commission's referee stepped out of her role as fact-finder and dabbled in medical diagnosis.

In the usual worker's compensation case, the causation issue generally comes down to a battle of the experts—the claimant's expert testifying that the injury was work-related, and the employer/surety's expert testifying to the contrary. In those situations, the Commission must parse through the evidence and determine which expert's testimony is the more reliable. That did not happen in this case. Here, the only expert who testified on the issue of causation was Henry's cardiologist, Dr. Parent, who testified that the heart attack was precipitated when Henry was

climbing a set of stairs at work. Neither the employer nor the surety produced an expert to contest Dr. Parent's opinion testimony. Rather, the Commission's referee played devil's advocate, discrediting his opinion for lack of foundation but then relying on snatches of his testimony to posit that the heart attack was likely precipitated by events that occurred prior to Henry's arrival at work. In doing so, the referee appears to have transgressed from a finder of fact to somewhat of a medical diagnostician.

It should be observed that Dr. Parent was not a medical hired gun, who glances at an injured worker's medical records and then provides an erudite diagnosis. Dr. Parent is a board certified cardiologist who has been practicing in Boise since 1988. He began treating Henry on November 15, 2009, the date of his heart attack, and continued treatment thereafter. Thus, when his deposition was taken on March 4, 2011, he was quite familiar with Henry and the factors that affected Henry's cardiac health.

One thing that stands out in Dr. Parent's deposition testimony is the significant role that anxiety played and plays in Henry's cardiac well-being. Dr. Parent had an opportunity to observe this first-hand during the course of a stress test conducted ten days after the heart attack. He testified that Henry had trouble—experienced chest pain—during the stress test:

> He had trouble for sure. When the stress test was performed, he had reduced exercise capacity, the onset of chest discomfort and symptoms, he had EKG abnormalities that told us that he was threatening to have future heart attacks under stress conditions, and that he had ventricular tachycardia, which is an unstable life-threatening rhythm often provoked in patients with recent heart attacks, previous heart attacks, and ongoing ischemia.

> * **

> And I believe that chest pain occurred because he became so anxious and so emotional that he was running a very fast heartbeat, very rapid blood pressure, he was in distress. It was sort of self-inflicted, you might say, from his anxiety state. Not 'cause anything new had happened to his coronary arteries.

As a result of the foregoing, Dr. Parent recommended immediate bypass surgery, which was performed that same day.

Dr. Parent testified that Henry "is one of the most anxious people I've ever treated. And I think that anxiety is a major contributor to ongoing symptoms, recovery, and functionality in a patient." Dr. Parent said that Henry's work at the prison was a significant source of his anxiety.

11

The following exchange occurred at Dr. Parent's deposition with respect to the time that Henry was released to return to work:

> Q. [Henry's counsel] Okay. The reason I ask is if Mr. Henry said when he was released to return to work he had a lot of anxiety trouble, it scared him to be around inmates and he thought that his blood pressure was affected, and I wondered if you have any recollection of his reaction to returning to work?
>
> A. [Dr. Parent] I would concur with your statements about his returning to work. It caused him high anxiety, yes.

As to the cause of Henry's heart attack, it is important to consider Dr. Parent's predicate deposition testimony:

> Q. [Henry's counsel] All right, sir. You've indicated in letters to myself and to counsel that when Mr. Henry was late to work, he was hurrying in from a warm building to the cold outside; that the physical stress of that exercise triggered his heart attack.
>
> Can you explain, Doctor, the effect of cold weather on the efficiency of a heart and how that works? What I'm thinking, Doctor, is we always hear in the winter of people who are out shoveling snow and have heart attacks, and I was wondering if you could help us understand why.
>
> *A.* We know that the arteries are very dynamic in their size and under certain stimuli they will constrict. And *cold weather and anxiety cause constriction of the artery size so it narrows the channel.*
>
> We also know that mental stress, anxiety, exercise, and cold weather, blood pressure goes up, which puts a hemodynamic stress on the artery, increases the need for oxygen to the heart muscle. So at the same time flow needs to be augmented, there's now a reduction of flow because of constriction.
>
> *We also know that the hemodynamic stress and probably other factors that are hormonal related to release of certain hormones during stress and anxiety can cause an atherosclerotic plaque to rupture.*
>
> Q. I'm sorry?
>
> A. An atherosclerotic plaque to rupture.
>
> Q. Thank you.
>
> A. *When an atherosclerotic plaque ruptures, that is the inciting event of a coronary thrombosis. So anxiety, cold weather, physical activity, you have all the milieu in place to cause a coronary thrombosis to occur.*

Q.     Okay. Let me see if I can summarize that in a way that I understand, Doctor. And please correct me if I'm wrong. The way I understand it is, if Mr. Henry was anxious or in cold weather, the veins actually constrict some because of the cold weather and the anxious condition.

The anxiety and cold weather also requires—the body's telling the heart to pump faster to supply more blood, but the veins are constricted, so it's more difficult for the heart to do that, and that causes the blood pressure to go up. Am I right on that?

A.     *The blood pressure goes up because of anxiety and stress,* not because of —not as you had stated.

Q.     Okay.

A.     *The causality there would be anxiety and increased workload, blood pressure rising.*

Q.     All right. Do you continue to believe, Dr. Parent, that Mr. Henry's physical exertion against the setting of his underlying personality was the factor and the cause of his heart attack on the morning of November 15 of 2009?

A.     I believe it was a factor.

(emphasis added). In other words, a rupture of atherosclerotic plaque can result from a physical cause (narrowing of the artery related to cold weather and anxiety and consequent increase in blood pressure which puts greater stress on the artery, which can dislodge plaque) or chemical cause (anxiety-related release of certain hormones that can rupture the plaque), or a combination of the physical and chemical causal factors. Dr. Parent opined that these factors precipitated Henry's heart attack when he began climbing the stairs, which was somewhat over 30 minutes after he arrived at work.

The referee discounted Dr. Parent's medical opinion based solely on her conclusion that Dr. Parent had failed to consider Henry's activities prior to arriving at work on November 15 and was unaware that Henry was unwell upon arrival at work. According to the referee, "[b]ecause Dr. Parent failed to consider this evidence, his opinion lacked foundation." However, the referee clearly failed to read Dr. Parent's deposition carefully. When Dr. Parent was asked about factors that contributed to Henry's heart attack on November 15, 2009, the following exchange occurred:

13

Q.      [Respondents' counsel] And do you have an opinion as to the extent of the contribution?

A.      [Dr. Parent] Well, I stated on the letters before, I think, that 50 percent likelihood that these—there's a 50 percent causality of the activities of that day in triggering the heart attack.

Q.      Would your opinion with respect to causation change under a slightly different factual scenario, if the facts established that Mr. Henry commuted from Caldwell to his work; that on the morning in question he was aware he was running late while still in Caldwell prior to reporting for work at the correctional facility; that he entered a vehicle that he had not been warmed up, that had been parked outside, presumably was exposed to the same temperatures in Caldwell, or close to the same temperatures, and on route to Boise, although in a vehicle, and was aware he was late during that commute, do you think any of those factors may have caused the onset of the myocardial infarction that morning?

***

A.      It's a little bit like bending a stick and saying, when is the breaking point going to occur? You hear it crack, you hear it pop, you see some splinters, you see some fibers, and then the thing breaks.

So is there a time when he's been exposed to the scenario that you described, is that leading up to or helping prepare this artery for this occlusion, is this a contributor to it, it really becomes into fine points that are so difficult to be factual or scientifically based that you just can't distinguish that exact degree of contribution.

We don't know what's going on inside that artery. Was that artery—had a small plaque rupture during that time when he first got in the car? Was it happening as he was driving? Was it little bits of splitting of that atherosclerotic cap? Were things beginning to develop back then?

***

But can you say where along that day or the day before what was stressing his system, when was this -- when was the inevitable day that this thing was going to happen? *You have to look at it, I think, major stressors and minor stressors.*

*And, if I look at things, you know, the cold car, the cold steering wheel, the driving through the traffic*, were those stressors that were contributing? *They likely could have been, should have been*, you know, *considered*. But can you—how far can you dissect that down? That's where *I get in trouble of dissecting down all those*, you know, *minute events* that begin to occur.

14

(emphasis added). Dr. Parent was then asked:

> Q.     [Respondents' counsel] Would your opinion at all be affected by evidence which suggested he appeared to be ill when he went through the check-in station, the first building he entered that day after coming from the parking lot?
>
> A.     [Dr. Parent] *I think a nonmedical person* looking at someone who's late to work and who's under stress *might easily make a judgment on somebody's health.* Mr. Henry is an anxious person who displays that anxiety on his sleeve and you see that in him.

(emphasis added). So, Dr. Parent was filled in as to all the activities that allegedly occurred before Henry arrived at work and of all evidence relating to feelings of unwellness that may have existed prior to the heart attack. It is apparent that Dr. Parent evaluated what he considered "major stressors and minor stressors" in considering the pre-arrival activities and that he considered the unwellness observations made by "nonmedical" persons in giving the following critical testimony:

> I don't think that artery was closed when he was getting in the car that morning or when he drove from Caldwell to Boise. I think it closed when he was walking up those stairs, and it hit him very suddenly."

So, even considering all of the factors that the referee thought should have been taken into account, Dr. Parent did take them into account in reaffirming his opinion.[2]

It might have been helpful if someone had asked Dr. Parent what he meant by the artery closing—whether it was the constriction or narrowing of the artery that resulted in a rupture of the plaque or whether it was the plaque actually occluding the circumflex artery. However, neither the referee nor this Court has the medical expertise to second-guess Dr. Parent's opinion. Presumably, a board-certified cardiologist is aware of the time it typically takes for a rupture to

---

[2] The referee also found Dr. Parent's testimony insufficient and flawed "because he failed to rule out the early morning activities." In forming and stating his opinion that Henry's heart attack was precipitated when he began climbing the stairs, Dr. Parent was not required to "rule out" any particular factors. Rather, he was required to consider Henry's history, the factors that affected Henry's heart health, and the activities that Henry engaged in both before and after arriving at work. Dr. Parent did so in reaffirming his initial opinion during the taking of his deposition. He considered major and minor stressors and apparently ruled out minor stressors that may have been "minute events," in reaching his determination. Based on his experience and expertise, he unequivocally testified that the heart attack was precipitated at that time and place. This is not a situation where the cause is unknown, requiring that other possible causes be ruled out.

result in an occlusion and it was his opinion that it occurred suddenly. Dr. Parent was certainly aware of the major stressors affecting Henry, particularly his high anxiety, the anxiety Henry's workplace environment caused him, the role anxiety can play in causing a plaque rupture, and the confluence of these factors as Henry began climbing the stairs at work on November 15.[3] In any event, the referee intermingles plaque rupture, blockage, and thrombosis in her findings. For example:

> 34.    In addressing the question of causation in this case, a pivotal issue is ascertainment of when the thrombosis actually occurred. Obviously, if the circumflex artery blockage occurred prior to Claimant's arrival at the workplace, it is impossible to associate that event with his post-arrival activities. Since it is the blockage of the artery that produces symptomatology, it should be possible, as Dr. Parent has noted, to ascertain when the blockage occurred, by determining when the symptomatology began.

> 35.    Dr. Parent has supposed that the blockage occurred after Claimant arrived on the premises, and there is evidence in the record to support the proposition that Claimant's symptoms worsened considerably following his arrival at the workplace. Specifically, Dr. Parent considered Claimant's exertional activities after he arrived at work including walking 75 yards from his car to a security checkpoint, walking another 25 yards into the Administration Building, waiting while his belongings were inspected, walking through the Administration Building where he passed through another security checkpoint, when walking as fast as he could for 450 yards until he reached Unit 15, where he climbed stairs.

> 36.    However, there is also testimony of record which would suggest an onset of symptomatology prior to Claimant's arrival on the premises. In this regard, recall that Mr. Kimmel testified that Claimant reported feeling unwell during his drive to the prison and a coworker commented that he looked unwell on arrival at the Administration Building. Further, Dr. Parent did not consider Claimant's pre-work exertional activities, although he agreed they were likely contributory. In fact, Dr. Parent neither discounted nor quantified any other of the morning's activities in terms of their contribution to the closure of the affected artery at that point in time. At one juncture, Dr. Parent even implied that activities from the day before could have put processes in motion that made Claimant's heart attack on November 15 inevitable.

---

[3] The role that stress and anxiety played, as opposed to the cold temperature, is heightened by the referee's finding that "the evidence is insufficient to establish that Claimant was actually exposed to any risk of vasoconstriction due to cold temperatures." One might question the medical qualifications of the referee to make such a finding but, nevertheless, it is a finding placed on the record by the referee and approved by the Commission. If the cold did not contribute, then the role of stress and anxiety becomes preeminent. And, this nicely coincides with Dr. Parent's testimony.

37. Considering the totality of the evidence, even the fact of Claimant's worsened post-arrival condition ultimately fails to establish that the injurious event which ultimately caused the blockage occurred after Claimant arrived at the worksite.

There are a number of glaring errors in the foregoing findings. First, although Henry's counsel advised Dr. Parent in his April 6, 2010 letter that by the time Henry got to the Administration Building "he did not feel very good, kind of had a general feeling of malaise," he also reported that Henry "had no specific symptoms." It is true that Henry told a co-worker that he was feeling "unwell" and that Mr. Kimmel testified Henry told him that when he had come in to work that day "he wasn't feeling well" and "during the drive and things like that he should have kind of paid attention to, I guess, his own feeling of," but there is absolutely no evidence in the record to support a finding that Henry had "an onset of symptomology" prior to arriving at work, or that he had any pre-arrival "symptoms" that could considerably worsen after arrival. There is no evidence indicating how or why Henry felt "unwell," what the cause of the malaise was or that it was symptomatic of anything, or to what Henry should have paid attention during his drive to work. There is no evidence in the record that any of these factors were symptomatic of a heart attack. Dr. Parent knew that Henry had a general feeling of malaise when he initially formed his opinion. The doctor was advised of that and the other pre-arrival factors during his deposition, prior to the time that the doctor gave his testimony reaffirming his initial opinion. It appears the doctor was not much impressed by the reports of "nonmedical" persons, particularly where there were no reports of symptomology. It is understandable that a board-certified cardiologist might feel his own experience is more important than the general, uninformed observations of lay persons in formulating a medical diagnosis. Yet, the Commission placed great store in the layperson unwellness reports in discounting Dr. Parent's testimony.

The referee also asserted that Dr. Parent did not consider Henry's pre-work exertional activities in developing his opinion. As shown above, however, Dr. Parent considered those activities in unequivocally reaffirming his opinion. The referee claims Dr. Parent "agreed they were likely contributory." That is not correct. In his deposition, Dr. Parent testified they should be "considered" ("They likely could have been, should have been, you know, considered.") And, he did just that in reaffirming his opinion. The referee apparently concluded that all of Mr. Henry's pre-arrival and post-arrival activities were equal-value stressors. In other words, getting

into a cold car in Caldwell or being late for work were entitled to equal weight with climbing a set of stairs at a workplace that caused Henry a great deal of anxiety. That isn't necessarily the case. As Dr. Parent testified, after having been advised of all of the pre-arrival activities asserted by Respondents, "you have to look at . . . major stressors and minor stressors." There is no indication that Dr. Parent did not give greater weight to major stressors, such as Henry's unusual anxiety about his workplace, in forming his opinion. And, there is no indication in the record that the referee had the qualifications or was better positioned to weigh the various stressors or to form a medical opinion as to what precipitated the heart attack. Had the Respondents wished to question or rebut Dr. Parent's opinion testimony, they certainly had it within their power to hire their own expert for the purpose of doing so. It was not up to the referee to second-guess or rebut Dr. Parent's opinions.

> In a 1937 worker's compensation case, this Court stated:

> The rule applicable to all witnesses, whether parties or interested in the event of an action, is, that either a board, court, or jury must accept as true the positive, uncontradicted testimony of a credible witness, unless his testimony is inherently improbable, or rendered so by facts and circumstances disclosed at the hearing or trial. *Manley v. Harvey Lumber Co.*, 174 Minn. 489, 221 N.W. 913, 914. In *Jeffrey v. Trouse*, 100 Mont. 538, 50 P.2d 872, 874, it is held that neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability. And, in *Arundel v. Turk*, 16 Cal.App.2d 293, 60 P.2d 486, 487, 488, the rule is stated thus: "Testimony which is inherently improbable may be disregarded, * * * but to warrant such action there must exist either a physical impossibility of the evidence being true, or its falsity must be apparent, without any resort to inferences or deductions."

*Pierstorff v. Gray's Auto Shop*, 58 Idaho 438, 447−48, 74 P.2d 171, 175 (1937). *See also Dinneen v. Finch*, 100 Idaho 620, 626−27, 603 P.2d 575, 581−82 (1979); *Wood v. Hoglund*, 131 Idaho 700, 703, 963 P.2d 383, 386 (1998).

Furthermore, this Court has held that when the findings of the Commission "are not supported by substantial, competent evidence, they are not binding or conclusive, and upon appeal will be set aside." *Dean v. Dravo Corp.*, 97 Idaho 158, 161, 540 P.2d 1337, 1340 (1975). Whether the findings are supported by substantial, competent evidence is a question of law to be determined by the Court. *Id.* In *Dravo*, the Court was considering a case where the worker's compensation claimant's physician provided the only testimony pertaining to causation. *Id.* The Court concluded that "contrary to the determination by the Commission, the testimony of Dr.

18

Colburn as to the causation is consistent and uncontradicted," despite the fact that on cross-examination the doctor "conceded it was impossible, medically speaking, to state without some conjecture" that a subsequent injury was related to an earlier work-related injury. *Id.* The Court looked to an Oregon worker's compensation case, *Clayton v. State Compensation Dep't.*, 454 P.2d 628 (Or. 1969), for guidance on reliability of medical testimony. *Id.* According to the Court, the principal issue in the *Clayton* case was "whether the stress and fatigue sustained in the decedent-husband's work was a causal factor in producing his heart attack." *Id.* The only medical testimony was presented by a doctor "who was unable to find a probability of causation in that particular case." *Id.* Our Court approvingly quoted the following from the *Clayton* court's opinion:

> In making a diagnosis the doctor draws upon the conclusions of medical science demonstrating that certain diseases can be traced to certain causes. These conclusions are not stated in absolutes; they are expressed in terms of probabilities. From the empirical study of many cases medical science can say that if certain symptoms are present there is a probability that certain disease is present. The probability is stronger in the identification of some diseases that it is in others, depending upon what has been learned about the causes for the particular disease. The diagnosis in a particular case involves the reasoning that since this probability has been established in cases in general the probability exists in the particular case being diagnosed. In the absence of evidence showing that the particular case in issue is distinguishable from cases in general it must be accepted that where medical science finds a probable causal relationship for the general group probable legal cause is established for the particular case being litigated. 454 P.2d at 631.

*Dravo*, 97 Idaho at 161−62, 540 P.2d at 1340−41. The Oregon court reversed the finding of no causation made by the lower court. *Clayton*, 454 P.2d at 632−33. In other words, absolute certainty is virtually unattainable in determining causality in the heart attack arena, but competent medical experts can establish medical probabilities based on their expertise.

In *Dravo*, we concluded:

Dr. Colburn's testimony that in his opinion there was a probable relationship between the October 1969 injury and the ultimate necessity for the operation stands uncontradicted. There is a lack of competent, substantial evidence to sustain the Commission's finding to the effect that the doctor's testimony was changed on cross-examination, as the question asked of him dealt with an issue immaterial to principal question.

*Dravo*, 97 Idaho at 162, 540 P.2d at 1341. In other words, a competent physician's testimony as to causation, when consistent and uncontradicted (or, as stated in *Pierstorff*, not "inherently improbable"), is not subject to being disregarded, simply because the physician asserts, as Dr. Parent did here, that you can't say with certainty exactly when a stick will break when it is bent, that you can't go inside an artery to see exactly when a plaque ruptures, and that you can't say for certain when a minor stressor might play some minute part in contributing to a heart attack. Dr. Parent stated his opinion that Henry's artery closed when he was climbing the stairs, causing him to very suddenly experience a heart attack and he reaffirmed that opinion after being fully briefed of all of the pre-work factors and activities. The Respondents were fully aware of what Dr. Parent's testimony would be, yet they failed to bring in their own expert to try to pick his opinion apart. Anyone who has tried a case involving medical causality knows that it is unwise to try to prevail upon cross-examination in such a case.

In this case, Dr. Parent had an intimate knowledge of the workings of Henry's heart, what it responded to, how stress and anxiety played a large part in its well-being, and what factors might precipitate a thrombosis in that heart. Indeed, ten days after the heart attack, Dr. Parent had the opportunity during the stress test to see a virtual replay wherein Henry came close to a heart attack brought on largely because of his unique anxietal state. With this knowledge and his unquestioned expertise, he was by far in the best position of all of the players to determine what precipitated Henry's heart attack. Neither the referee, nor the Commission which relied upon the findings of the referee, nor anyone else, was in a better position to make that determination. There is absolutely no grounds to disregard or reject Dr. Parent's opinion and the Commission erred in doing so. I would reverse the Commission's decision.

Chief Justice BURDICK CONCURS.